UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AIEDA MCCALLUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:12-cv-01529 |
| | ) | |
| ARCHSTONE COMMUNITIES LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF AIEDA MCCALLUM'S MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT ARCHSTONE'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

I.   INTRODUCTION.................................................................................1

II.  STATEMENT OF FACTS....................................................................4

     A.   McCallum Excelled as a Concierge and Leasing Consultant................................4

     B.   McCallum Gives Notice of Her Pregnancy........................................6

     C.   McCallum is Fired Two Weeks After Announcing her Pregnancy.........................9

     D.   The Pretextual Grounds for Termination..............................................11

     E.   McCallum's Disciplinary History Prior to her Termination................................18

III. LEGAL ARGUMENT.......................................................................22

     A.   McCallum Easily Establishes a
          Prima Facie Case of Pregnancy Discrimination....................................22

     B.   Ms. McCallum Has Offered Substantial Evidence of Pretext..............................23

          1.   The Close Nexus in Time Raises
               an Inference of Pregnancy Discrimination................................23

          2.   The Managers' Negative Reaction to McCallum's
               Pregnancy is Further Evidence of Discrimination....................................24

          3.   The Reasons Cited for the Firing are Suspect............................................25

          4.   Wolfe Disciplined Other Non-Pregnant, Similarly-
               Situated Employees Less Severely for More Serious Offenses.................29

IV.  CONCLUSION................................................................................30

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AIEDA MCCALLUM,        )
                           )
      **Plaintiff,**      )
                           )
     **v.**            )     Civil Action No. 8:12-cv-01529
                           )
ARCHSTONE COMMUNITIES LLC,  )
                           )
                           )
     **Defendant.**     )

## PLAINTIFF AIEDA MCCALLUM'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT ARCHSTONE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Aieda McCallum, by and through her undersigned counsel, hereby submits this Memorandum of Points and Authorities in Opposition to Defendant Archstone's Motion for Summary Judgment.

## I.    INTRODUCTION

Before Aieda McCallum informed her managers that she was pregnant with twins, Archstone considered her to be a "strong Leasing Consultant," whose appraisal summed up her performance as "dynamite." See Exhibit C (McCallum performance appraisal). Then, on June 15, 2008, McCallum announced her pregnancy, and two weeks later was fired.

When they learned of her pregnancy, the attitude of McCallum's supervisors (Leisa Wolfe and Letitia Taylor) changed instantly. Whereas previously they had been complimentary and friendly toward McCallum, upon learning of her pregnancy, they immediately turned cold and distant. They derided her "condition" as a reason to alter her job responsibilities, and chided her to "cover up that baby belly." Exhibit A (McCallum Deposition excerpts) at 182, 197-99,

204-06.  On June 30, 2008, Wolfe fired McCallum -- relying largely on alleged rule infractions that had supposedly occurred *before* she announced her pregnancy.

These putative infractions were trivial at best, and nothing close to the sort of egregious misconduct that gets an employee fired.  Indeed, even Archstone's own 30(b)(6) witness admitted that the majority of infractions that Archstone now relies upon in its motion to justify the firing were minor.  Exhibit F (Lynch 30(b)(6) Deposition excerpts) at 212, 215, 225-27, 243. Archstone liberally uses verbal and written counseling memoranda to remind their associates of company policy; and the record is replete with instances of coworkers (who were not pregnant) receiving multiple corrective actions of this nature, but not losing their jobs.  On this evidence, a jury could reasonably find that this differential treatment, coming so close on the heels of Archstone learning of McCallum's pregnancy, is the hallmark of discrimination.  Indeed, federal courts in this Circuit and elsewhere have repeatedly held that precisely this type of evidence – suspicious timing, a sudden change in attitude, derisive comments about the pregnancy, and differential treatment, provides sufficient proof to hold a trial on the ultimate issue of motive. See Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358 (3d Cir. 2008) (in pregnancy discrimination case, evidence of temporal proximity, combined with evidence of differential treatment toward similarly situated employees, stray comments by the decision-maker suggesting animus, and evidence that the plaintiff had not violated the rules as the employer claimed she did, was sufficient to defeat summary judgment); Asmo v. Keane, Inc., 471 F.3d 588, 594-98 (6th Cir. 2006) (temporal proximity between disclosure of pregnancy and adverse employment action, along with additional evidence tending to show pretext, is sufficient to withstand summary judgment); DeBoer v. Musashi Auto Parts, Inc., 124 Fed. Appx. 387, 2005 U.S. App. LEXIS 3328 (6th Cir. 2005) (unpublished) (same); Troupe v. May Department Stores, 20 F.3d

734, 736 (7th Cir. 1994); <u>Canavan v. Rita Ann Distributors</u>, CCB-03-3466, 2005 WL 670777 (D.

Md. Mar. 23, 2005) (Blake, J) (denying summary judgment where employee was fired eight days

after announcing her pregnancy).

Indeed, Archstone presents little to counter this persuasive evidence of pretext.

Defendant offers no testimony from either Ms. Wolfe or Ms. Taylor denying that they were

motivated by McCallum's pregnancy in the decision to fire her.  Instead, Archstone relies almost

entirely on an affidavit from Jeanne Lynch, a 30(b)(6) witness who had absolutely no

involvement – none – in the events leading to McCallum's firing.  Lynch also admits that she

never even spoke with Wolfe or anyone else who was involved in the firing, and thus has no

personal knowledge whatsoever to offer.  <u>See</u> Exh. F (Lynch 30(b)(6) deposition excerpts) at

206.  All of her testimony is derived from her review of Archstone's litigation position (its

response to Ms. McCallum's EEOC charge and its interrogatory answers in this case) all

prepared by defense counsel.  Lynch's declaration is pure hearsay, inadmissible at trial and

equally inadmissible at the summary judgment stage.  <u>See Maryland Highways Contractors</u>

<u>Ass'n, Inc. v. State of Maryland.</u>, 933 F.2d 1246, 1251 (4th Cir. 1991) ("several circuits,

including the Fourth Circuit, have stated that hearsay evidence, which is inadmissible at trial,

cannot be considered on a motion for summary judgment").

On this record, there is ample basis for a jury to infer that Ms. McCallum's pregnancy

was a motivating factor in her firing.  And that is all that is required, because "the question at the

summary judgment stage is not whether a jury is sure to find a verdict for the plaintiff; the

question is whether a reasonable jury could rationally so find."  <u>Hoyle v. Freightliner, LLC</u>, 650

F.3d 321, 334 (4th Cir. 2011).  Archstone's bid to avoid a trial here must be denied.

II.  **STATEMENT OF FACTS**

A.   **McCallum Excelled as a Concierge and Leasing Consultant**

Plaintiff Aieda McCallum[1] was hired by Archstone in March 2007 as a Resident

Concierge and served in the position ably.  Ms. McCallum performed her job so well that in

August 2007 -- only five months after she began with the company -- Archstone promoted her to

the position of Leasing Consultant.  See Archstone's Memorandum and Points of Authority in

Support of its Motion for Summary Judgment (hereinafter, "Defendant's Brief") at 3-4; Exhibit

(hereinafter "Exh.") A (McCallum deposition excerpts) at 97, 121.  Ms. McCallum was a

Leasing Consultant for Archstone at its Westchester Cherry Lane facility from August 2007 until

she was fired on June 30, 2008.

As a Leasing Consultant for Archstone, Ms. McCallum performed her job well.  In

general, during her tenure at Westchester Cherry Lane, she outperformed her peers at the facility

in terms of the number of apartments she leased.  See Exh. B (McCallum Declaration) at ¶5.

Ms. McCallum's performance was formally assessed by Archstone only once, in

November 2007, roughly three months into her tenure as a Leasing Consultant.  See Exh. C

(Performance Review).  She received an overall score of "Meets Expectations."  Id.  While the

review identifies several areas for improvement (as virtually *all* Archstone appraisals do), it also

makes clear that Ms. McCallum was a valued employee and that Archstone thought she had a

bright future with the company.  The review contains the following positive assessments of her

work and attributes:

- "[S]he does a great job, and is good with following up."

---

[1] Plaintiff remarried after the events giving rise to this action occurred, and legally changed her name to Aieda McCallum.  However, at the time she was employed by Archstone, Plaintiff went by her former name, Aieda Hopkins.

- "Aieda leads in leases"

- "Overall she is polished"

- "Aieda is a great communicator.  She is very personable and our prospects normally come away feeling good about their tour."

- "Aieda uses everything in her arsenal to get the lease.  She is dynamite.  She can take her show on the road and lease anywhere when she fully masters her craft.  She can sell 'ice to an Eskimo.'"

- "[Interpersonal/customer service] is Aieda's strongest area.  She is a defender and provider for the residents.  She started with us as Resident Concierge because of this strength, but she was hungry and the commission incentive won her over.  Every chance she gets she falls back to her natural skill, an aid to the residents.  She genuinely wants to provide them with everything she can to resolve their issue."

- "Aieda presently aspires to be a Leasing Manager.  This is not a long shot for her."

- "*Aieda is a strong Leasing Consultant*."

Id. (emphasis added).

Ms. McCallum was a valued employee who regularly received praise from each of her managers for her hard work and dedication.  See Exh. B (McCallum Declaration) at ¶¶1-4; Exh. D (09/11/07 Email from Archstone Operations Manager Duane Wooldridge to resident Shawn Drew, stating, "We too, have been impressed with [Aieda McCallum's] ability to make people feel at home with her sincere customer service approach.").  Even after Leisa Wolfe, the supervisor who fired Ms. McCallum, took over as Community Manager at Westchester Cherry Lane, she regularly acknowledged that Ms. McCallum was doing a terrific job, had high sales, and went "above and beyond" to help residents.  Exh. A (McCallum Deposition) at 124-27, 130; Exh. B (McCallum Declaration) at ¶3.  Ms. Wolfe regularly assigned Ms. McCallum the tasks of researching competitors ("shopping comps") and making concessions recommendations -- both signs of increasing trust and reliance on Ms, McCallum's skills.  See Exh. B at ¶4.  Residents

also frequently provided Archstone positive feedback regarding Ms. McCallum's work. <u>See</u>,

<u>e.g.</u>, Exh. D. For example, one resident wrote to Archstone management:

> I'm sending this brief message to express just how impressed I am about
> the service I received from Leasing Consultant Aieda Hopkins [] on a
> recent visit to your Westchester at Cherry Lane community. Ms. Hopkins
> cordially showed me several apartment homes that fit my stated desires.
> Her service (with a smile) and professional manner was simply refreshing.

<u>Id</u>. (09/11/07 Email from resident Shawn Drew to Archstone managers Brunk, Wooldridge and

Robinson) at MCC0017. Another resident wrote management about Ms. McCallum as follows:

> Ms. Aieda Hopkins has impressed me time and time again with her fine
> tuned professionalism, kindness, and honesty. From the first day I arrived
> here at this Apartment location searching for my next home, Aieda
> welcomed me with such respect and no pre-judgment. . . . Ms. Hopkins is
> a powerful asset to your team here at Archstone Apartments in Laurel.
> From the time I first entered the doors here, during my move, and even
> after my move Ms. Hopkins has been a smiling, helpful, and professional
> face that has made my already incredible transition here that much more of
> a great one for me. It is my intent to publically acknowledge and
> commend Ms. Hopkins for her outstanding service and professionalism...

<u>Id</u>. (09/17/07 Email from resident K. Butler to Archstone managers Robinson and Wooldridge)

at MCC0018. Indeed, Ms. McCallum continued to receive positive feedback regarding her

performance right up until the moment she disclosed her pregnancy. Exh. A (McCallum

Deposition) at 124-27; Exh. B (McCallum Declaration) at ¶2-4,6.

**B.    <u>McCallum Gives Notice of Her Pregnancy</u>**

Ms. McCallum learned she was pregnant with twins sometime in May 2008. It is

undisputed that Ms. McCallum informed her supervisors, Community Manager Leisa Wolfe and

Leasing Manager Leticia Taylor, that she was pregnant with twins at a weekly staff meeting at

the Westchester Cherry Lane facility on June 15, 2008. <u>See</u> Defendant's Brief at 2; Exh. A at

193-94. Ms. Wolfe's and Ms. Taylor's explicit reactions to the pregnancy, and striking change

in behavior upon notice of Ms. McCallum's pregnancy, suggest a causal connection between the disclosure of her pregnancy and her abrupt termination which occurred just two weeks later.

Both Ms. Wolfe and Ms. Taylor reacted negatively to the news of Ms. McCallum's pregnancy. Upon hearing the news, Leticia Taylor's eyes opened wide and she looked over at Ms. Wolfe. Ms. Wolfe shook her head with a smug facial expression and then she looked down at the ground. Neither congratulated Ms. McCallum. Exh. B at ¶6.

In fact, after June 15, Ms. Wolfe and Ms. Taylor ceased meeting with McCallum in the mornings. Exh. A (McCallum Deposition) at 194-95. Before Ms. McCallum announced her pregnancy, Wolfe and Taylor had regularly met with her to discuss work issues. Exh. B at ¶7. After June 15, Wolfe and Taylor ceased almost all communication with Ms. McCallum regarding work-related issues, which severely undermined Ms. McCallum's ability to do her job. Id. When Ms. McCallum tried to approach them with work questions, they would refuse to speak to her and say in a hostile tone, "not now," or "I'm busy" or "you handle it." See Exh. A at 195-96. Ms. Taylor refused to make eye contact with Ms. McCallum anymore. See Exh. B at ¶8. Ms. McCallum began to notice that Ms. Wolfe was following her around the buildings, using "smoke breaks" as excuses to be outside when Ms. McCallum was conducting tours so that she could observe Ms. McCallum working. See Exh. A at 211-212, 215. Ms. McCallum suspected and feared that Ms. Wolfe was scrutinizing her work behavior looking for shortcomings. See Exh. B at ¶9.

In one of the few interactions Ms. McCallum had with Leticia Taylor after disclosing her pregnancy, Ms. Taylor admitted that she viewed Ms. McCallum's pregnancy as incompatible with her job responsibilities. When Ms. McCallum returned to the office one day after dealing with a difficult visitor to the facility, Ms. Taylor told her that, "in your condition" (referring to

Ms. McCallum's pregnancy), it wasn't "wise" for Ms. McCallum to approach visitors to the property. Exh. A at 204-06. Greeting visitors and conducting tours was one of Ms. McCallum's central job responsibilities as a leasing consultant. See Defendant's Brief at 4; Exh. E (Leasing Consultant job description); Exh. A at 206.

On another occasion after June 15, Ms. Taylor made a comment indicating that she thought Ms. McCallum's pregnancy would make it difficult for her to do her job. Ms. McCallum had left the office to prepare several apartment units for imminent move-in. When she came back from inspecting and tidying the apartments, Ms. Taylor told Ms. McCallum that she had been worried about her and asked if Ms. McCallum had fainted. When Ms. McCallum responded that she was not gone an unusually long time and asked Ms. Taylor why she would be worried, Ms. Taylor responded that, because of Ms. McCallum's pregnancy, she was worried about her health. Ms. McCallum responded that she was being treated differently because she's pregnant and told Taylor, "that's not right." Ex A at 197-199. Preparing units for move-ins was also one of Ms. McCallum's central job responsibilities as a leasing agent. See Exh. E (job description).

Leisa Wolfe also openly commented negatively on Ms. McCallum's pregnancy. On June 28, 2008, two days before Ms. McCallum was fired and in one of the few interactions that she had with Ms. Wolfe after disclosing her pregnancy, Ms. Wolfe approached her, patted her on the stomach and told her she needed to "cover up that baby belly."[2] Exh. A at 182. Ms. McCallum

---

[2] Archstone in its brief wrongly asserts as undisputed that Wolfe: 1) denied that she had ever touched Ms. McCallum on the stomach or told her to cover up that baby belly; and 2) denied discriminating against Ms. McCallum. See Defendant's Brief at 13. Even apart from the fact that these assertions are, in fact, disputed, Archstone offers no record evidence to properly support these assertions; they are pure hearsay. Archstone cites only to a declaration of Jeanne Lynch, Archstone's Vice President for Human Resources and its 30(b)(6) witness in this case. But Lynch admitted that she was completely uninvolved with the termination of McCallum.

was wearing her standard black blazer at the time which, due to her pregnancy, she could not

comfortably button in front but which otherwise fit her. Exh. B at ¶10; Exh. G (termination

memo). Ms. Wolfe instructed Ms. McCallum to buy a new blazer, which she did: as soon as her

shift ended that day, she went to the store and bought the best fitting jacket she could find. Exh.

B at ¶10; Exh. G.

Ms. McCallum wore her new blazer to work on Sunday, June 29 and then Monday, June

30. On Monday, June 30, 2008, Ms. Wolfe approached her and accused her of wearing the same

jacket that she had told her to replace the previous Saturday. Ms. McCallum informed her that

she had purchased a new, larger jacket, and actually stood up to show Ms. Wolfe that she could

comfortably button the new one in front. See Exh. B at ¶10.

### C.  McCallum is Fired Two Weeks after Announcing her Pregnancy

On Monday, June 30, 2008, Ms. McCallum was summoned to Ms. Wolfe's office at the

end of her shift and summarily fired.[3] Exh. A (McCallum Deposition) at 175. Ms. Wolfe

handed Ms. McCallum a document itemizing several instances of alleged misconduct and briefly

walked Ms. McCallum through the list. Exh. G. Ms. McCallum had never seen the document

before. But for her discussions with Ms. Wolfe regarding her need to "cover up her baby belly,"

neither Ms. Wolfe nor any other Archstone employee had ever discussed with her any of the

---

Exh. F (Lynch 30(b)(6) Deposition excerpts) at 40. She prepared to testify as a 30(b)(6) witness
by merely reviewing Archstone's response to the EEOC (i.e., its litigation position). Id. at 11-
16. Even assuming Archstone could surmount the hearsay hurdle, Lynch testified that she never
in fact spoke with Wolfe about the McCallum matter, or with anyone else who participated in
firing McCallum in 2008. Id. at 62, 66-67, 91-92, 94, 202. Her testimony lends nothing to
Archstone's defense.

[3] Archstone is not sure when Leisa Wolfe made the decision to fire Ms. McCallum, but believes
it was likely sometime between June 18 and 30. Exh. F (Lynch 30(b)(6) Deposition) at 203. It is
therefore undisputed that Wolfe was aware of Ms. McCallum's pregnancy at the time she decided
to fire her. See Defendant's Brief at 11.

purported misconduct mentioned in the document. Exh. B (McCallum Declaration) at ¶12. At no point during the meeting was Ms. McCallum given the chance to look for documentation or otherwise take time to respond to the allegations made against her. Exh. B at ¶13. At one point, Ms. Wolfe tried to pressure her to admit the allegations against her, which she wouldn't do. Id. at ¶18. In a distraught state, she wrote a written response to some of the allegations Ms. Wolfe made against her, and then she was told to pack up and leave the building. Id.

In the course of the termination meeting, Ms. McCallum told Ms. Wolfe that she thought her termination was discriminatory and a direct result of her recently announced pregnancy. Exh. A at 180. Ms. Wolfe cryptically responded that if Ms. McCallum had raised the issue before, she might not have been fired, but she also gave her the name and telephone number of Michelle Levix, one of Archstone's human resources employees who worked at Archstone's Virginia headquarters.[4] Id. at 180, 188-89, 261-63.

The next day, on July 1, Ms. McCallum contacted Ms. Levix by phone, and informed her that she thought her termination was due to her pregnancy, but Ms. Levix's only response was that the company stood behind Ms. Wolfe's decision. Exh. A at 190, 261-63. Neither Ms. Levix, nor any other Archstone employee, conducted an investigation to determine whether McCallum was properly fired.[5] See Exh. F (J. Lynch 30(b)(6) deposition excerpts) at 93.

---

[4] Although Wolfe made the decision to fire McCallum, Archstone claims that she likely did so in consultation Michelle Levix, who worked in Archstone's human resources department. Exh. F (Lynch 30(b)(6) Deposition) at 202. There is simply no evidence of this anywhere in the record. Archstone admits that it doesn't know for sure whether Wolfe actually sought Levix's input, or the input of anyone else in Archstone's human resources department, prior to firing McCallum. Id. at 204. Indeed, Archstone claims not to know whether or not its standard practice for deciding whether to terminate an employee was followed in this instance. Id. at 204. None of the documentation suggests that Levix was in any way involved.

[5] Archstone's only "investigation" into the matter occurred over a year after Ms. McCallum's termination in response to her EEOC charge. See Defendant's Brief at 13. Its failure to timely

That was the last Ms. McCallum heard from Archstone, and it went on to replace her with a male Leasing Consultant and/or a female Leasing Consultant who Archstone did not believe to be pregnant. <u>See</u> Defendant's Brief at 13.

### D.   The Pretextual Grounds for Termination

In the written termination memo, Archstone alleged the following instances of alleged misconduct:

- that Ms. McCallum was late to work twice in over two months:  20 minutes late on May 10, and 15 minutes late on June 7.

- that when Ms. McCallum (permissibly) called in sick on June 8, she called the Archstone answering service instead of calling her supervisor.

- that she came to work on June 28 wearing a blazer that she wasn't able to button in front, and then came to work on June 30 wearing a blazer that was "barley [sic] able to button."

- that on June 30, Ms. McCallum spoke to Archstone's cleaning service regarding two units that needed to be cleaned that day.

- that, on June 11, in response to an internet lead contest, McCallum had supposedly entered inaccurate information into Archstone's computer system.  Archstone claimed that Ms. McCallum indicated that she had left a voicemail in response to the lead, which it further claimed was not possible because no phone number had been provided by the lead.  This Archstone characterized as "falsification" of company records.

<u>See</u> Exh. G.  There is sufficient evidence for a jury to find that each of the reasons cited in the memo were mere pretext for discrimination.

<u>Regarding the supposed attendance issue</u>, Archstone could cite only two instances in over two months when Ms. McCallum had been late to work -- 20 minutes on May 10, a good seven

---

investigate Ms. McCallum's internal complaints of discrimination was directly contrary to its policies and protocol. If an Archstone employee, at the time of termination or shortly thereafter, alleges that he or she believes the termination was discriminatory, Archstone's standard protocol is to investigate those allegations to make sure that discrimination did not occur. Exh. F (Lynch 30(b)(6) Deposition) at 207. Such an investigation would be conducted by human resources and would include an interview with the complainant. <u>Id</u>. at 207-08. None of that happened in this instance.

,

weeks before Ms. McCallum was fired; and 15 minutes on June 7, over three weeks before Ms. McCallum was terminated. Archstone never once discussed with Ms. McCallum either instance of lateness prior to her disclosure of her pregnancy, Exh. B at ¶¶12,16, and there is absolutely no indication in the record that her managers intended to take any action until after they learned of her pregnancy. Ordinarily, Archstone supervisors do not wait seven weeks to address tardiness if they are genuinely concerned about it. See, e.g., Exh. H (5/09/08 M. Simmons Counseling Record for attendance issue that occurred on 05/07/08). Moreover, Archstone does not claim: 1) that a leasing consultant could not call in late due to illness or otherwise on occasion; 2) that Ms. McCallum lacked a valid reason for being late on those two days; 3) that Ms. McCallum had exceeded her leave limit; or 4) even that these two instances of lateness otherwise violated an Archstone policy. [6]

Perhaps recognizing the inherently insignificant nature of these two instances of lateness, Archstone makes much of an April 21, 2008 email from Leisa Wolfe counseling the entire Westchester Cherry Lane staff regarding Archstone's attendance policies. Although Archstone claims that Wolfe in her email threatened "immediate termination" for further infractions, see Defendant's Brief at 2 ("Ms. Wolfe placed all of the leasing staff on notice that they must comply with the work rules or face immediate termination."), the email itself states just the opposite: "[i]f further infractions to our attendance policy are incurred, *written documentation will be*

---

[6] Regarding Ms. McCallum's alleged misconduct of contacting Archstone's answering service when she called in sick on June 8 rather than calling her supervisors directly, had Ms. Wolfe provided Ms. McCallum an opportunity to explain, Ms. McCallum would have told her that she tried to telephone a supervisor on the morning of June 8, but they had not arrived at work yet and were not picking up the phone. Exh. B (McCallum Declaration) at ¶17. Only after trying unsuccessfully to reach them did Ms. McCallum leave a message with Archstone's answering service, Telelink. Id. And after her shift began, Ms. McCallum actually did call Archstone and speak to a manager to explain that she would be out sick. Id. Again, Archstone never even discussed this issue with Ms. McCallum before it decided to fire her, even though it happened a week before she disclosed her pregnancy and three weeks before her termination. Id.

*imminent*," and "[n]ot calling and not showing up *will result in immediate written warning.*" Exh. I (04/21/08 Email from Wolfe re attendance policies) (emphasis added). Thus, if anything, the April 21 email suggests that occasional lateness or other types of attendance issues were not considered by Archstone or Leisa Wolfe to be terminable offenses.

This interpretation is fully consistent with Archstone's treatment of Westchester Cherry Lane Leasing Consultant Melissa Simmons, who also received the April 21, 2008 email from Leisa Wolfe, see Exh. H (M. Simmons' Assoc. Time & Attendance Agreement). When Ms. Simmons was *over one hour late* to work on May 7, 2008, and also failed to properly notify her supervisors, she received only a "written counseling." Id. (M. Simmons Counseling Record). Likewise, when Westchester Cherry Lane Leasing Manager[7] Leticia Taylor, who was also subject to Wolfe's April 21 email, violated Archstone's rules by not timely submitting time sheets for her overtime, she was only given a "final written counseling." Exh. J (L. Taylor 10/02/08 final written counseling).[8]   Neither Ms. Simmons nor Ms. Taylor was pregnant at the time they engaged in this conduct similar to that of Ms. McCallum, but neither was fired.

Regarding Ms. McCallum's "violations" of Archstone's dress code, Archstone admits that they were not serious instances of misconduct. Exh. F (Lynch 30(b)(6) Deposition) at 243. Her dress code violations were actually her inability to "cover up her baby belly," in the words of Ms. Wolfe. While it is true that Ms. McCallum was not able to button her blazer in front, it otherwise fit her and she was otherwise dressed appropriately for work. See Exh. B at ¶10.   And as soon

---

[7] All Archstone employees are subject to the same disciplinary rules and policies, irrespective of the position they held. Exh. F (Lynch 30(b)(6) Deposition) at 136-37. Thus, for purposes of comparator evidence, Ms. Taylor's job category is not relevant.

[8] The relatively lighter discipline Archstone gave to Ms. Simmons and Ms. Taylor for violating attendance policies appears consistent with how Archstone treats its other employees. See, e.g., Exh. K (Archstone Leasing Consultant C. Hall given verbal counseling in December 2008 for reporting to work 14 minutes late and then 56 minutes late within 3 days).

as she was asked by Wolfe to "cover up her baby belly," Ms. McCallum went out and bought another jacket which she could button in the front, but which Ms. Wolfe apparently determined was still too tight fitting. <u>See</u> Exh. A at 183-85; Exh. G; Exh. B at ¶10.

Regarding Ms. McCallum's supposed improper communication with the cleaning contractors, Ms. McCallum supposedly erred when she bumped into the cleaning contractors on June 30 and confirmed with them that her two apartments were on their list of units to be cleaned that day. Exh. A at 202-03. Ms. McCallum had in fact tried to speak with Ms. Wolfe and Ms. Taylor about the need for the apartments to be cleaned, but neither one of them was communicating with Ms. McCallum after she had disclosed her pregnancy. Exh. B at ¶¶ 7,15. McCallum's job required her to make sure that the apartments that she leased were clean and ready for move-in, and Archstone disciplines its leasing consultants for failing to assure that leased apartments are ready for move-in. Exh. F at 178; Exh. L (T. Snead is twice disciplined for failing to assure that her units were clean and otherwise ready for move in; she is counseled in the future to "take ownership" of the problem and to "communicate problems to the Service Team"); Exh. E (job description); Exh. A at 197. Even Archstone admits that this was not a serious incidence of misconduct. Exh. F at 239. A jury could find that this example of supposed misconduct actually shows that Ms. McCallum was a dedicated employee trying her best to serve her customers, but that Ms. Wolfe was willing to seize upon any excuse to justify firing her.

Regarding the alleged falsification of data -- the centerpiece of Archstone's supposed justifications for terminating Ms. McCallum -- the record is littered with evidence suggesting that Archstone never seriously believed that Ms. McCallum's data entry error was intentional and did not actually terminate her for that reason.

To begin, Archstone admits (as it must) that it has absolutely no basis to say that Ms. McCallum intentionally falsified Archstone's records.  Indeed, Archstone now admits that the data discrepancy could have been nothing more than an inadvertent data entry error on the part of Ms. McCallum.  Exh. F at 105.  And Archstone also admits that such an inadvertent error would neither satisfy its definition of falsification of company records nor warrant a termination.  Id. at 105, 107-08.  On the basis of these two admissions alone, a reasonable jury could conclude that Archstone never believed Ms. McCallum was guilty of intentional falsification.

In fact, at the time the data error came to light, Archstone's own marketing employee, Christina Hershey, raised the possibility that this was nothing more than inadvertent error or an innocent computer glitch.  In a June 18, 2008 email, Ms. Hershey informed Leisa Wolfe of the inaccurate data entry in Archstone's MRI database, and in her email raised the possibility that the problem was caused by a computer "glitch."  Exh. M (6/18/08 Email from Hershey to Wolfe). She also asked Ms. Wolfe to investigate to see whether Ms. McCallum had sent an email response to the internet lead.  Id.  But none of that ever happened.  Archstone offers no evidence that Ms. Wolfe or any other Archstone employee actually searched Ms. McCallum's sent email to determine whether this was, in fact, merely a computer glitch. See Exh. F at 85, 89, 116. There is no evidence that Ms. Wolfe even ever responded to Ms. Hershey. Id. at 89.  And of course, no one spoke to Ms. McCallum about it at the time; they only raised it with her after deciding to fire her two weeks later.

This is significant, because by latching immediately on to a supposed conclusion that intentional falsification of records had occurred, Ms. Wolfe violated Archstone's own internal practices and procedures.  In circumstances where Archstone suspects an employee of falsification of documents (or any other serious misconduct), it is Archstone's standard practice

to interview the suspected employee before drawing any conclusions regarding what actually happened and/or whether a serious incident of misconduct actually occurred. Exh. F at 101, 134. But in this instance, Ms. McCallum was never shown the documentation that Archstone presents now regarding her alleged data entry error and was never given a meaningful opportunity to respond.[9]  Exh. A at 17-18, 217-19. Notably, Ms. McCallum's alleged infraction occurred on June 11, 2008, and Wolfe was informed of the issue on June 18, 2008. Wolfe had almost two weeks within which to question Ms. McCallum about the issue, but she failed to do so, contrary to Archstone's standard practice. Archstone now admits that it would have been appropriate to show Ms. McCallum the screen shot and internet lead contest information before deciding to fire her, so that she had an opportunity to tell her side of the story. Exh. F at 245-46. Here again, a jury could reasonably infer that Ms. Wolfe did not genuinely believe that there was dishonesty here, but instead used this as the pretext to justify firing Ms. McCallum after learning of her pregnancy.

It is undisputed that, prior to June 18, 2008, Ms. McCallum had no record of dishonesty with Archstone. Exh. F at 85. When confronted with the accusation for the first time on June 30, Ms. McCallum could not recall the specific lead she supposedly responded to on June 11. Exh. B at ¶13. Her job required her to respond to multiple internet leads per day and this lead had come in over two weeks earlier. Id. Because she was never afforded an opportunity to go back through her records and determine what actually happened, to this day she is not sure

---

[9]  Indeed, if any party is guilty of falsification of company records, it is Archstone, not Ms. McCallum. In Ms. McCallum's termination memo, which was prepared before she was ever questioned about the matter, Archstone states, "When approached, Aieda was unable to provide any additional documentary support to this lead." See Exh. G (termination memo). This is false. Ms. McCallum was never approached about the supposed discrepancy prior to June 30 and was never provided an opportunity to search her computer records or other files to explain the discrepancy. Exh. A (McCallum Deposition) at 217-19.

whether she did in fact enter inaccurate information into the system. Id. But she was and still is

adamant that, even if she did enter inaccurate information into Archstone's computer system, she

never did so intentionally. See Exh. G (termination memo) ("I . . . mistakenly messed up the

MRI Lead. I would never knowingly disrespect the company or its practices"); Exh. A at 217.[10]

Contrary to Archstone's assertion in its brief, see Defendant's Brief at 9, McCallum never

"admitted that she had not responded to the potential lessee." Exh. G; Exh. B at ¶13.

There is also substantial record evidence that other, non-pregnant similarly situated

Archstone employees were treated differently. With respect to Westchester Cherry Lane non-

pregnant Leasing Manager Leticia Taylor, who arguably engaged in much worse instances of

falsification of data, Ms. Wolfe was willing to give her the benefit of the doubt. On July 23,

2008, Ms. Wolfe gave a written warning to Ms. Taylor for multiple incidents of misconduct,

including logging overtime under suspicious circumstances. See Exh. J (7/23/08 Taylor

Coaching Record) ("She has logged large amounts of overtime over the past few weeks. This is

unexplainable as there are not a lot of results to explain in at so many tasks are being left

incomplete."). An employee who claims overtime for work she could have completed in her

normal work hours is engaging in serious misconduct. But Taylor was not fired.

Moreover, by Oct 2, 2008, Ms. Wolfe's impression of Ms. Taylor's performance hadn't

improved, and she cited her for no less than *seven* performance deficiencies, including entering

---

[10] Archstone suggests that the prospect of getting paid an extra $150 for winning the internet lead contest provided Ms. McCallum with an incentive for falsifying the data. See Defendant's Brief at 20. But Ms. McCallum was paid on commission for leasing units. Id. at 4; Exh. B (McCallum Declaration) at ¶14. Her primary financial incentive in responding to leads was the prospect that the lead would develop into an actual leasing opportunity. Exh. B at ¶14. Commissions from leasing were a substantial portion of McCallum's income. She had no idea that the particular internet lead at issue was not legitimate and was sent only for purposes of the contest. See Defendant's Brief at 8-9. She had every incentive to promptly and properly follow up with all leads she received, as this was the way she made her living.

false information into Archstone's MRI system regarding whether a resident had paid a security deposit. Id. (Taylor 10/02/08 final written counseling) (Taylor cancelled out the residents' obligation to leave a security deposit after SafeRent determined the resident needed to leave one and the resident's check was returned for insufficient funds. "When it was brought to her attention, she was unaware of the status of the file.")  For these more numerous and arguably more severe infractions, Taylor was given a "final written counseling" – she was not fired. Id.

And regarding Archstone's reaction to other employee misconduct during an internet lead contest, Archstone's 30(b)(6) witness could identify no employee except Ms. McCallum who was ever disciplined for conduct related to an internet lead contest. Exh. F at 23, 37. Of the 191 leasing consultants who were eligible to participate in the internet lead contest, only 158 responded and 33 did not respond at all. Id. at 72. There is no evidence in the record to suggest that any were disciplined in any way, much less terminated.

Likewise, Archstone has a secret shopping program which is similar to its internet lead contests because in both situations, the leasing consultants do not know that the prospective client/lessor who makes contact is not genuine. Yet even when leasing consultants fail three consecutive secret shops, Archstone does not terminate them. See, e.g., Ex L (02/11/11 T. Snead "Final Written Warning" Counseling Record for failing three consecutive secret shops).

E.   **McCallum's Disciplinary History Prior to her Termination:**

Archstone tries to make much of four prior instances of verbal counseling that Ms. McCallum received, but its own 30(b)(6) witness described all of them as relatively minor issues; indeed, a jury could reasonably find that most of them were trivial. None of the prior counseling records, nor any alleged misconduct underlying them, was ever cited by Archstone as

a basis for McCallum's termination.[11]  See Exh. G (termination memo); Exh. B (McCallum Declaration) at ¶19.  There is no evidence in this case to suggest that Ms. Wolfe was even aware of these prior verbal counselings.

Verbal counseling is the lowest form of discipline in Archstone's progressive discipline process, Exh. F (Lynch 30(b)(6) Deposition) at 229, and is used for minor instances of misconduct.  Sometimes, as was the case with Ms. McCallum, Archstone provides a verbal counseling even where the employee has done nothing wrong, presumably solely to educate or remind an employee of Archstone's rules and policies.  Each of Ms. McCallum's counselings occurred within the first six months of her becoming a Leasing Consultant and at least five months before she was fired.

**The prior counselings:**

1.   On Aug 30, 2007, right after Ms. McCallum was promoted to leasing consultant, she received her first verbal counseling for wearing an Archstone-issued company shirt to work.  See Exh. N (08/30/07 verbal counseling record); Exh. F at 211.  Archstone had given Ms. McCallum the shirt intending that she wear it as part of her work uniform – it was a button-down white oxford with the Archstone logo on the right breast pocket.  See Exh. B at ¶20.  Apparently, sometime after giving Ms. McCallum the shirt, Archstone modified its dress code at the Westchester Cherry Lane such that,[12] while leasing agents still had to wear a button-down white oxford, they could no longer wear the ones with the Archstone logo.  See Exh. A at 133,

---

[11] To the extent that Archstone in its brief tries to suggest that Ms. McCallum's prior verbal counselings played any role in her termination, see Defendant's Brief at 8, it offers no record evidence to support this assertion.

[12] In fact, Archstone's dress code for leasing consultants at the Westchester Cherry Lane facility changed several times during Ms. McCallum's tenure with the company.  Exh. A (McCallum Deposition) at 134.

150-55. But Archstone never told McCallum of the change. See Exh. B at ¶20; Exh. N. Ms. McCallum was verbally counseled about the policy change and told to buy a new shirt, which she promptly did. See Exh. N. Archstone admits that this was not a serious instance of misconduct. Exh. F at 212. Its effort to rely on this innocuous event as a basis for summary judgment is specious.

   2. On October 16, 2007, Ms. McCallum was verbally counseled regarding Archstone's policies against "fraternizing" with tenants and creating the appearance of a conflict of interest. Exh. O (10/16/07 verbal counseling record). Ms. McCallum denied any improper fraternization, and explained that she had never entered the resident's apartment after his move in and did not have communications with the resident in the hall outside his apartment. Id. Indeed, the tenant himself denied any wrongdoing on McCallum's part. Id. The documentation of the verbal counseling is not specific as to what, if anything, Ms. McCallum was determined to have done in violation of Archstone's policies.[13] But whatever Archstone believes Ms. McCallum may have done to give rise to this verbal counseling, Archstone admits that this was not a serious instance of misconduct either. Exh. F at 215.[14]

   3. On Jan 7, 2008, Ms. McCallum was verbally counseled for supposedly canceling out applicants in the computer system. Exh. P (01/07/08 verbal counseling record).

---

[13] Contrary to Archstone's assertions in its brief, see Defendant's Brief at 6, the counseling memo does not state that Ms. McCallum fraternized with Westchester Cherry Lane residents, and does not state that Ms. McCallum visited the apartment of a male resident for non-business related matters. See Exh. O (10/16/07 verbal counseling memo).

[14] It wasn't unusual or suspicious for Ms. McCallum to interact with residents at the property. Her job responsibilities as Leasing Consultant required her to stay in contact with residents at the facility where she worked. Among other things, she was responsible for responding to resident requests for information, for maintenance and repairs, and just about any other problem a tenant had. Exh. A (McCallum Deposition) at 109-10; Exh. E (Job Description).

This too was the lowest disciplinary action possible and, according to the supervisor who did the counseling, was made for "documentation purposes only." Id.; Exh. F at 218-19.

        4.  On Jan. 18, 2008, McCallum was counseled verbally for taking bereavement leave and sick leave, and punching in and out on her time card multiple times during lunch time. Exh. Q (01/18/08 verbal counseling record).  Although Archstone in its brief describes Ms. McCallum's conduct as a "pattern of unexcused absences," see Defendant's Brief at 7, Archstone admits that Ms. McCallum actually did "nothing" wrong in taking bereavement leave in the manner in which she did.  See Exh. F at 225.  Archstone also admits that it has no basis to say that Ms. McCallum did anything wrong with respect to the sick leave discussed in this verbal counseling.  Id. at 226.  As for the multiple time card punches, Ms. McCallum explained that she clocked in and out on several occasions at the behest of another supervisor who asked her to come off her lunch break early to conduct tours.  See Exh. Q; Exh. A at 165.  According to Archstone, this explanation was actually a demonstration of positive employee behavior, rather than misconduct.  Exh. F at 227.

        These four instances of verbal counseling were the only times that Ms. McCallum was "disciplined" at Archstone prior to her termination.  Ms. McCallum never faced anything beyond a verbal counseling prior to her termination -- no written counselings (the next step above verbal counseling), no final warnings, no suspensions. Exh. F at 229-230.   Indeed, for the five months immediately preceding her termination -- from January 18, 2008 to June 30, 2008 – Ms. McCallum received no discipline of any kind.

## III.   LEGAL ARGUMENT

### A.   McCallum Easily Establishes a
### Prima Facie Case of Pregnancy Discrimination

Discrimination based on pregnancy is unlawful, 42 U.S.C. § 2000e(k), and Ms.

McCallum easily establishes a *prima facie* case of pregnancy bias.   Indeed, Archstone concedes

three of the four elements of her *prima facie* claim: that McCallum's pregnancy was protected,

that her firing was an adverse action, and that she was replaced by someone outside the protected

class.   See Defendant's Brief at 17.

Archstone takes issue with just one element of the *prima facie* burden, arguing that

McCallum cannot show that she met the legitimate expectations of her employer.   That is

nonsense.   The only appraisal of McCallum rated her overall performance as "Meets

Expectations."   Exh. C.   This alone suffices to satisfy her modest *prima facie* burden.   But the

review also says that McCallum "does a great job, and is good with following up;" called her

"polished" and a "great communicator. . .[and] very personable."   Id.   Overall, "Aieda is a strong

Leasing Consultant."   Archstone is in the business of leasing apartments, and Ms. McCallum

shone at this aspect of her job:   "Aieda uses everything in her arsenal to get the lease.   She is

dynamite."   Id.   Thus, this is not a case where the plaintiff tries to rely on her own subjective

view of her performance to meet her *prima facie* burden.   Rather, Archstone's own appraisal of

McCallum carries that weight.[15]

---

[15] And if, as Archstone tries to argue, the existence of minor counseling memoranda means that an employee is not meeting the legitimate overall expectations of her employer, then the same would be true for other employees with multiple disciplinary actions, like Tia Snead and Leticia Taylor, who were not fired.

**B.**     **Ms. McCallum Has Offered Substantial Evidence of Pretext**

A discrimination plaintiff has a variety of tools available to prove the ultimate issue of

her employer's motivation.  Here, there is abundant circumstantial evidence of bias on which a

jury could reasonably find discrimination.

### 1.     The Close Nexus in Time Raises an Inference of Pregnancy Discrimination

In <u>Asmo v. Keane, Inc.</u>, 471 F.3d 588, 594 (6th Cir. 2006), the plaintiff was fired two

months after the employer learned of her pregnancy, and the Sixth Circuit held that the "temporal

proximity is sufficient to establish a link between [plaintiff's] pregnancy and her termination for

the purposes of a prima facie case."  Courts in this Circuit agree.  <u>See</u>, <u>e.g.</u>, <u>Fink v. Richmond</u>,

CA DKC 2007-0714, 2008 WL 9364730, at *10 (D. Md. Mar. 24, 2008) ("The lapse of less than

two months is sufficient evidence of causation to satisfy the third prong of the *prima facie*

case").  Of course, this evidence is not only pertinent to the *prima facie* analysis.  As the

Supreme Court emphasized in <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133, 143

(2000), "the trier of fact may still consider the evidence establishing the plaintiff's prima facie

case and inferences properly drawn therefrom ... on the issue of whether the defendant's

explanation is pretextual."

Here the temporal duration was not two months but **two weeks**.  This close nexus

between the firing and the date when McCallum's supervisors learned of her pregnancy is

powerful evidence of discrimination.  <u>See</u>, <u>e.g.</u>, <u>Vance v. Potter</u>, CA No. 5:05CV00013, 2006

WL 3761626, at *7 (W.D. Va. Dec. 22, 2006) (two week gap between notice and protected

activity sufficient to raise an inference of causation); <u>Canavan</u>, CCB-03-3466, 2005 WL 670777,

at *5 (evidence that employee was fired eight days after disclosing pregnancy raised inference of

discriminatory intent); <u>C.A.R.S. Protection Plus</u>, 527 F.3d 358 (in pregnancy discrimination case,

evidence of temporal proximity, combined with other evidence, was sufficient to show pretext); Asmo, 471 F.3d at 594-98 (temporal proximity between disclosure of pregnancy and adverse employment action, along with additional evidence tending to show pretext, is sufficient to withstand summary judgment); DeBoer, 124 Fed. Appx. 387, 2005 U.S. App. LEXIS 3328 (unpublished) (same); Troupe v. May Department Stores, 20 F.3d 734, 736 (7th Cir. 1994).

> **2.    The Managers' Negative Reaction to McCallum's
> Pregnancy is Further Evidence of Discrimination**

This close nexus in time between learning of the pregnancy, and McCallum's firing does not stand alone.  There is ample evidence of pregnancy discrimination above and beyond the temporal proximity.  When Ms. McCallum's supervisors learned she was pregnant, they did not congratulate her and instead glowered.  See Exh. B (McCallum declaration) at ¶6.  In Asmo, the plaintiff's supervisor similarly withheld congratulations when he learned of her pregnancy, and the court deemed it significant: "The most significant evidence showing pretext is [plaintiff's supervisor's] conduct after [plaintiff] announced she was pregnant with twins. . . . [The supervisor's] initial silence is suspect.  Pregnancies are usually met with congratulatory words, even in professional settings."  471 F.3d at 594.

Similarly, in the two weeks following the disclosure of McCallum's pregnancy, Wolfe and Taylor were hostile toward Ms. McCallum and repeatedly made snide comments about her "condition," and her "baby belly."  Exhibit A, at 182, 197-99, 204-06.  As noted by Judge Posner writing for the Seventh Circuit in Troupe, 20 F.3d at 736, pregnancy discrimination can be inferred from circumstantial evidence which "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn."

3.      **The Reasons Cited for the Firing Are Suspect**

Archstone did not produce Leisa Wolfe herself or any other company official involved in

the firing.  Indeed, in response to a notice of deposition under Federal Rule of Civil Procedure

30(b)(6), Archstone produced a human resources official, Jeanne Lynch, who had **no** first-hand

information about any of the events at issue.  Ms. Lynch was asked if she had any knowledge

"any of these events, personal knowledge."  Her response: "Not firsthand, no" See Exh. F

(Lynch 30(b)(6) deposition excerpts) at 206.  Ms. Lynch played no role in the termination, id. at

40; she did not talk to Leisa Wolfe, the firing official, id. at 67; she did not talk to the human

resources officials who may have been involved, id. at 202.

Since Ms. Lynch has no personal knowledge, anything she said about Ms. McCallum was

based on hearsay, and Archstone may not use Ms. Lynch's statements in support of its motion.

See, e.g., Maryland Highways Contractors Ass'n, Inc. v. State of Maryland, 933 F.2d 1246, 1251

(4th Cir. 1991) ("several circuits, including the Fourth Circuit, have stated that hearsay evidence,

which is inadmissible at trial, cannot be considered on a motion for summary judgment").

Ms. Lynch did offer useful testimony about Archstone's policies.  She explained that the

verbal counseling was the least serious disciplinary measure at Archstone.  Exh. F at 35.  Above

that are written warnings, final written warnings and ultimately termination.  Id.  Furthermore, all

employees are held to the same standards, regardless of their rank.  That is, the company does

not approach disciplinary issues differently based on the position held by the employee.  Id. at

136-37.

Until her firing, Ms. McCallum had never received anything above the mildest form of

discipline – the verbal counseling.  Exh. F at 229.  Archstone's only explanation for the firing is

set forth in a memo (called a Counseling Record) that Leisa Wolfe gave Ms. McCallum when

she fired her on June 30, 2008.  See Exh. G.  The memo touches on six different putative

misdeeds, including attendance; improper contact with the cleaning crew; falsification of company documents (which was discovered through a supposed "audit of our internet leads"); and improper attire.

A jury might well conclude that the length and breadth alone show that Ms. Wolfe had decided to fire Ms. McCallum and employed a laundry list of reasons. Judge Posner has noted that EEO cases are difficult "because it is so easy to concoct a plausible reason for . . . firing . . . a worker who is not superlative." See Riordan v. Kempiners, 831 F.2d 690, 697-98 (7th Cir. 1987). It is evident that Wolfe was seeking to "concoct a plausible reason" for firing McCallum.

First, Ms. Wolfe did not discuss these matters with Ms. McCallum before she fired her on June 30. In other words, when Ms. McCallum "was presented with this document, the decision to fire her had already been made." Exh. F (Lynch 30(b)(6) deposition) at 243. This was contrary to Archstone policy, as Ms. Lynch acknowledged: "before we actually terminate an associate, we would have talked to them about the situation." Id. at 205. Ms. Lynch agreed that it was "not Archstone's standard practice to fire an employee based on an accusation of misconduct without at least getting their side of the story." Id. at 101. Ms. Wolfe, though, did not follow this established procedure. As in Jones v. WMATA, 205 F.3d 428, 434 (D.C. Cir. 2000), Wolfe acted in "violation of [Archstone's] procedures in firing [plaintiff] without affording her an opportunity to explain her behavior." Her failure to follow Archstone policy and procedure when she fired Ms. McCallum is evidence of pretext. Id.; see also DeBoer v. Musashi Auto Parts, Inc., 124 Fed. Appx. 387, 2005 U.S. App. LEXIS 3328 at *19-20 (6th Cir. 2005) (unpublished) (evidence that when the employer demoted the pregnant plaintiff, it failed to

fully comply with its own policy of counseling employees prior to demoting them was indicative of pretext.)[16]

In fact, Ms. Wolfe did not talk to Ms. McCallum about any of the items on the termination memo save one – and the one exception betrays her bias. On Saturday, June 28, Ms. Wolfe approached Ms. McCallum, patted her on the stomach and told her she needed to "cover up that baby belly." See Exh. B (McCallum declaration) at ¶10. Ms. McCallum immediately purchased a new jacket, which she wore to work on Monday, June 30, but Ms. Wolfe expressed dissatisfaction with the new one, too. Id. On this alone, a jury could reasonably find that Ms. Wolfe was disturbed by McCallum's pregnancy.

On the merits, the items listed in the termination memo are lightweight, with the exception of the accusation that Ms. McCallum deliberately falsified data. And that accusation is plainly false.

First, Ms. Wolfe claimed that Ms. McCallum was 20 minutes late on May 10 and 15 minutes late on June 7. These were certainly not firing offenses.[17] Notably, before June 30, Ms. Wolfe never raised either incident with Ms. McCallum. Exh. B (McCallum declaration) at ¶16. See DeBoer v. Musashi Auto Parts, Inc., 124 Fed. Appx. 387, 2005 U.S. App. LEXIS 3328 at

---

[16] Archstone also violated its policies and procedures by not promptly investigating McCallum's complaints of pregnancy discrimination that she lodged with Wolfe and human resources at the time of her firing. Exh. F at 101, 134, 207-08, 245-46. This procedural irregularity also is evidence of pretext. Jones, 205 F.3d at 434.

[17] Archstone says that Wolfe was tough on absences. The company points to her email of April 21, 2008, Exh. I, and says it warned of termination. It did not. The email says that if there are attendance infractions, "written documentation will be imminent." Id. The harshest language is reserved for "not calling and not showing up," which McCallum was not even accused of. Even so, the penalty was "an immediate written warning" -- not termination. Lynch did not how many other employees had attendance infractions after the April 21 email, whether they were punished and if so, what their punishments were. Exh. F at 235.

*17-18 (6th Cir. 2005) (unpublished) (evidence that the employer was aware of the plaintiff's supposed performance deficiencies but took no action in response to them until after it learned of her pregnancy was evidence of pretext).

Ms. Wolfe also said that Ms. McCallum had used the wrong procedure when calling in about a justified absence.  She called an automated answering service – Telelink – when she should have called her supervisors directly.  But on the day in question, McCallum repeatedly called Archstone's main number to speak with one of her supervisors, but none of them answered the phone.  Only then did she call Telelink, which she would have explained to Wolfe if given the chance.  See Exh. B (McCallum Declaration) at ¶17.  Again, Archstone did not raise this issue with McCallum until after it learned of her pregnancy.  See DeBoer, 124 Fed. Appx. 387, 2005 U.S. App. LEXIS 3328 at *17-18.

Ms. Lynch admitted that neither talking to the cleaning crew nor wearing the jacket that Ms. Wolfe criticized were serious offenses.  Exh. F at 239, 243.  This leaves one serious charge – that Aieda McCallum deliberately falsified information relating to a contest involving Leasing Consultants.  Archstone's marketing department sponsored the contest quarterly, in an effort to familiarize the Consultants with following up on leads from potential lessees posted on the internet.  The termination memo says that McCallum entered the wrong data on a lead, and suggests she did so intentionally, presumably to try to win the $150 prize.

McCallum was the single Leasing Consultant ever disciplined for conduct relating to the contest.  Exh. F at  23, 37.  A jury might well be skeptical of Archstone's thesis of deliberate dishonesty, especially in view of the other evidence.

The termination memo mentions an "audit" of the contest.  The only audit was performed by Christina Hershey of marketing, who looked at the data submitted by the Westchester Cherry

Lane facility where Ms. McCallum worked. Exh. F. at 66. Ms. Hershey was concerned that there might be a problem with the computer system that did not properly process Ms. McCallum's entry. She wrote Wolfe an email asking her to "make sure a technical glitch did not occur." See Exh. M; Exh F at 84. Apparently, Wolfe never followed up. Exh. F at 85. Lynch knew, however, that McCallum had no record of dishonesty. Id.

There is no basis to claim that Ms. McCallum turned suddenly dishonest to capture a prize of $150. Ms. McCallum was paid on commission and a substantial portion of her compensation came from leasing units. Her primary financial motivation would have led her to pursue all leads that she could. A jury could reasonably reject the notion that a mere $150 prize would motivate Ms. McCallum under these circumstances, and it could also reject the notion that Archstone believed Ms. McCallum had intentionally falsified data and undermined her chances of increasing her commission-based compensation, all for the prospect of $150.

Summarizing, Ms. McCallum was the only Leasing Consultant ever disciplined for conduct in a contest; Christina Hershey of marketing was concerned about a "technical glitch" and asked Ms. Wolfe to look into it; Wolfe never did; and McCallum had no record of dishonesty. Had Wolfe followed standard Archstone policy and asked Ms. McCallum for her recollection, they might have discovered the "glitch." Instead, Wolfe fired McCallum.[18]

### 4.   Wolfe Disciplined Non-Pregnant, Similarly-Situated Employees Less Severely for More Serious Offenses

Leisa Wolfe fired McCallum for trivial matters. But Wolfe spared two employees whose offenses were far more serious, Tia Snead and Leticia Taylor. Among other things, Snead failed

---

[18] Ms. McCallum's record, which Archstone assails, was devoid of any discipline above the minimum. Ms. Lynch repeatedly acknowledged that the matters were not serious, and acknowledged that Wolfe's termination memo does not consider the prior discipline. See Exh. F at 212, 247-48.

a test three times (the mystery shop), supposedly a firing offense. But Snead was not fired, and Lynch said she did not know why. Exh. F. at 177.

Wolfe's email of April 21, 2008 covered proper documentation of the need for overtime. Yet Leticia Taylor logged large amounts of overtime, and Wolfe called it "unexplainable." Exh. J; Exh. F at182-83. In addition, the lease files for which Taylor had responsibility were not being completed in a timely and accurate manner. Exh. J; Exh. F at 188. Yet Wolfe didn't even give Taylor a verbal warning. Instead, Wolfe administered a coaching conversation, something less onerous. Exh. J; Exh. F. at 192.

Both Snead and Taylor committed offenses that were at least as serious as anything that McCallum was alleged to have done. But they were not pregnant, and they kept their jobs.

## IV.    **CONCLUSION**

McCallum has made a strong *prima facie* showing of pregnancy discrimination, and she has produced evidence that Archstone's reasons for firing her – as set forth in the termination memo – are pretextual. In the Fourth Circuit, such a showing is enough to survive summary judgment.

As in EEOC v. Sears Roebuck and Co., 243 F.3d 846 (4th Cir. 2001), here the plaintiff has "made out a strong prima facie case" of pregnancy discrimination, and has "offered ample evidence to discredit [defendant's] proffered non-discriminatory reason" for the firing:

> Under Reeves, this showing is sufficient to permit a trier of fact to "infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves, 120 S.Ct. at 2108. Indeed, Reeves teaches that when "the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Id. at 2108-09.

EEOC v. Sears Roebuck, 243 F.3d at 854 (quoting Reeves , 530 U.S. 133 (2000)).  The Supreme

Court's decision in Reeves, coupled with the Fourth Circuit's decision in EEOC v. Sears

Roebuck, control this case.

      In sum, this record presents a wealth of evidence upon which a jury could reasonably find

that pregnancy discrimination infected the decision to fire Aieda McCallum.  There is:

- temporal proximity (2 weeks between the disclosure and her firing);

- the negative reaction by Ms. McCallum's supervisors upon learning of her pregnancy (admonishing her to "cover up that baby belly";

- Archstone's failure to follow its established procedures and company policy by not meeting with McCallum before firing her for supposed serious misconduct, and by not investigating her complaint of discrimination at the time she first raised the issue;

- the statements from supervisors suggesting that they thought McCallum's "condition" undermined her ability to do her job;

- the fact that non-pregnant employees were not fired for similar or worse instances of misconduct;

- the fact that Archstone knew of several of the purported instances of misconduct (the alleged falsification and attendance issues), but did not make any effort to discipline McCallum until after she disclosed her pregnancy.

- Archstone's admission that it did not view most of McCallum's alleged misconduct as "serious."

- evidence that Archstone did not genuinely believe that she had engaged in any "falsification," and

- Archstone's utter failure to offer any admissible evidence of Wolfe's state of mind in deciding to fire McCallum.

On this record, summary judgment must be denied.

Respectfully submitted,

Richard A. Salzman (D. Md. No. 15840)
Susan E. Huhta (D. Md. No. 14547)
Douglas B. Huron (D. Md. No. 12893)
HELLER, HURON, CHERTKOF &
SALZMAN, PLLC
1730 M Street, N.W., Suite 412
Washington, D.C. 20036
Phone: (202) 293-8090
Fax: (202) 293-7110
Email: ras@hellerhuron.com
         seh@hellerhuron.com

Matthew Handley
Robert Bruskin
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 319-1000
Fax:  (202) 319-1010

Counsel to Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify on this 30th day of May, 2013, I caused a copy of the foregoing Plaintiff Aieda McCallum's Memorandum of Points and Authorities in Opposition to Defendant Archstone's Motion for Summary Judgment, to be served with the Clerk of Court using CM/ECF, who will then send a notification of such filing to:

Nancy N. Delogu
Jennifer W. Thomas
LITTLER MENDELSON, P.C.
1150 17th Street, N.W.
Ste. 900
Washington, D.C.  20036
NNDelogu@littler.com
JWThomas@littler.com

Susan E. Huhta (D. Md. No. 14547)