## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **AIEDA MCCALLUM,** | |
| **Plaintiff,** | **Case No. 8:12-CV-01529** |
| **v.** | |
| **ARCHSTONE COMMUNITIES LLC,** | |
| **Defendant.** | |

## REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Archstone Communities LLC ("Archstone" or the "Company"), hereby submits its Reply to Plaintiff Aieda McCallum's Opposition ("Opposition") to Defendant's Motion for Summary Judgment ("Archstone's Motion").  In her Opposition, Plaintiff urges the Court not to grant Archstone's Motion, but fails to identify legitimate material facts in dispute that would allow her claim to survive.  Instead, she offers recently manufactured excuses, opinions, speculation, and conjecture, none of which are supported by the record, to suggest Archstone was motivated by an anti-pregnancy bias.  In contrast, Archstone's Motion is grounded upon contemporaneous documentary evidence that it was Plaintiff's repeated failure to follow Archstone's work rules, as documented by four different supervisors over a period of less than ten months that led to her termination.  Archstone's nondiscriminatory reasons for terminating Plaintiff's employment are in no way impugned by Plaintiff's assertions that others were treated better than she.  Plaintiff's supervisor terminated non-pregnant employees for similar offenses, and no retained co-worker who could legitimately be called a comparator had a similarly extensive disciplinary history.  Absent admissible evidence of a material dispute of fact

as to Plaintiff's performance shortcomings or Archstone's motive in disciplining her, Plaintiff's suit must fail.

I.     **ARGUMENT**

    A.     **Plaintiff Has Failed To Demonstrate That She Was Performing Her Job At A Level That Met Archstone's Legitimate Expectations.**

        1.     **The *Prima Facie* Case.**

Plaintiff cannot adduce admissible evidence sufficient to state a *prima facie* case of pregnancy discrimination.  To prove a claim of intentional discrimination under Title VII, a plaintiff may rely on either direct or circumstantial evidence of discrimination. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir. 1998); *Rosado v. Va. Commonwealth Univ.*, 927 F. Supp. 917, 929 (E.D. Va. 1996).  Plaintiff concedes that she lacks direct evidence of pregnancy discrimination.  Opposition at 22.  Thus, to state a claim for discrimination using circumstantial proofs, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) that at the time of the adverse action, she was performing at a level that met her employer's legitimate job expectations; and (4) her position was filled by a similarly qualified applicant outside her protected class or the employer continued to seek employees to perform the work plaintiff had previously performed. *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005) (*citing Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc) and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  A *prima facie* case *cannot* rest on "facts" supported only by belief, speculation, or unsupported conclusory allegations of discrimination. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).  Nevertheless, Plaintiff's Opposition focuses principally on unsupported speculation and conclusory accusations of discrimination, many of which allegations appear for the first time in her Opposition brief.

**2.      Plaintiff Was Not Meeting Archstone's Performance Expectations
At The Time Of Her Termination.**

Plaintiff dedicates exactly one paragraph of her thirty-two page Opposition brief to addressing her *prima facie* case, hoping the Court will overlook the dearth of evidence supporting her argument that she met Archstone's legitimate performance expectations. If Plaintiff cannot state even a threshold case of discrimination, however, an analysis of Archstone's motives is unnecessary. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).

In support of her contention that she met Archstone's performance expectations at the time of her termination, Plaintiff relies solely on a "meets expectations" rating she was given on a performance review issued on November 2007, three months after she assumed the Leasing Agent role and six months prior to her termination.[1]  That reliance is misplaced.  Although Plaintiff did receive an overall rating of "meets expectations," her supervisor Goslyn Robinson noted that her performance as a Leasing Agent had several shortcomings.[2]  *See* Archstone's Motion at ¶ 6 and Exhibit H to Archstone's Motion.  For example, Mr. Robinson noted "Aieda needs to work on her attendance… She tends to struggle on the weekends;" "Overall [Aieda] is polished, but at times she has some issues with properly fitting jackets and shirts." "With her team, I believe Aieda does what she wants to do then apologize [*sic*] later for it;" and, tellingly,

---

[1] In her unnumbered statement of facts, Plaintiff alleges she was a "valued employee who regularly received praise by her managers for her hard work and dedication."  In support of this assertion, Plaintiff relied on two emails she received from tenants in September 2007, which was one month after she became a leasing agent and nine months prior to her termination.  Although laudable, commendations from tenants are hardly indicative of Archstone's perception of her performance.  Regardless, Courts in the Fourth Circuit have held that congratulatory emails addressing only a portion of an employee's performance do not establish that the employee was meeting the employer's performance expectations.  *Riddick v. MAIC, Inc.*, Civ. No. JKS 09-33, 2010 U.S. Dist. Lexis 124915, *12 (D. Md. November 23, 2010) (Holding that five commendary emails sent to plaintiff in the less than three-month period prior to termination but that did not address plaintiff's overall performance are not sufficient to establish satisfactory performance for purposes of stating a *prima facie* case of discrimination.)
[2] Archstone's performance ratings included:  Top Achiever (best); Exceeds Expectations; Meets Expectations; Learning Curve, and Marginal Performer.  *See* Exhibit H to Archstone's Motion for Summary Judgment.

"[Aieda's] biggest hurdle is Aieda."[3]   *Id.*   Plaintiff has never contested the accuracy of that performance evaluation, perhaps because when presented with the review, she wrote in the employee comment portion of the document, "I feel most of my evaluation is accurate." Opposition at 23; *see also* Archstone's Motion at 6.   Unfortunately, Plaintiff's early struggles as a Leasing Agent foreshadowed her future difficulties in following Archstone's rules.

Even if her performance review communicated adequate performance in the early part of 2007, Plaintiff cannot credibly ask the Court to overlook her performance over the course of the next eight months.   In the less than ten months Plaintiff served as a Leasing Agent for Archstone, four different Archstone managers documented ten separate incidents in which Plaintiff failed to perform her job as directed, or violated Archstone's work rules.[4]   Archstone's Motion at ¶ 8. Four of the documented criticisms of Plaintiff's performance were issued prior to the announcement of her pregnancy, and all but two policy violations occurred before she announced she was pregnant.   *Id.* at ¶ 8-11. Plaintiff, implicitly acknowledging her record of poor performance, now seeks to repudiate any responsibility for those violations: by suggesting that Plaintiff was not responsible for her errors, that Archstone did not consider her errors serious, and that both Archstone's disciplinary documents and her contemporaneous handwritten responses to those documents are inaccurate.   This she cannot do.   Those documents, which she signed, are the best record of what happened at the time; and in each case, Plaintiff did not dispute that she had engaged in the referenced conduct, although she repeatedly attempted to excuse her behavior as unintentional.

---

[3] In her Opposition, Plaintiff suggests that Archstone's employee appraisals always ask supervisors to note areas for improvement.   Opposition at 4.   This assertion is not supported by any record evidence and therefore should be given no weight.   Regardless, a quick review of the Performance Evaluation demonstrates that Mr. Robinson had the opportunity to rate Plaintiff significantly better than "Meets Expectations."

[4] Plaintiff alleges "Archstone liberally uses verbal and written counseling memoranda to remind their associates of company policy." Opposition at 2.   This assertion is not supported by any record evidence. Accordingly, the Court should give it no weight.

**3.      Plaintiff Admitted To Her Errors In Contemporaneous Written Records
And Deposition Testimony And Cannot Now Reject Those Admissions
Through Self-Serving Post Hoc Arguments.**

In August 2007, Mr. Robinson issued Plaintiff her first disciplinary action for violating
Archstone's dress code.   Plaintiff accepted responsibility for her actions and admitted to
violating the dress code policy in a handwritten note directly on the disciplinary record.  *See*
Archstone's Motion, Exhibit I, p. 1.  In her November 2007 performance review, Mr. Robinson
noted that she continued to have "issues with properly fitting jackets and shirts," and warned her
that failure to address that issue would impact her next performance evaluation, stating "To get
to the next level, Aieda needs to be more consistent in her attire."  Archstone's Motion, Exhibit
H.  At the time, Plaintiff acknowledged that her performance evaluation was largely accurate.
*Id.*

Plaintiff now asserts, in a Declaration created five years after her termination and nearly
six years after she was first counseled, that she was not informed of a change in Archstone's
dress code that would make the shirt she wore inappropriate.   *See* Opposition at 19 and
Plaintiff's Declaration (Exhibit B to Opposition) at ¶ 8.  This assertion directly contradicts both
the contemporaneous records of the incident and her more recent deposition testimony.  In her
deposition, Plaintiff testified at length regarding Archstone's dress code, recalling that the dress
code did not change until during the period when Ms. Wolfe became her supervisor in 2008.  *See*
McCallum Deposition pp. 130 – 138, attached hereto as Exhibit A.  And, while Ms. Lynch,
Archstone's Vice President of Human Resources, testified that although Plaintiff's violation was
not serious, she also noted that it was one of many such violations.  *See* Deposition of Jeanne
Lynch at pp. 103, 212, attached hereto as Exhibit B.   Plaintiff's novel assertion that Archstone
cannot now rely upon her documented dress code violations as evidence that she was not

meeting Archstone's expectations therefore relies wholly on a self-serving and unreliable Declaration apparently manufactured specifically for the purpose of attempting to defeat Archstone's Motion for Summary Judgment.   Plaintiff's Opposition is, in fact, replete with unsupported and contradictory assertions that should be given no weight in evaluating the strength of her claim.[5]

Plaintiff was disciplined again two months later for "visiting a resident's home for non-work related issues, fraternizing with residents on-site outside of work hours, and allowing residents to publicly present social invitations to her" in violation of Archstone's Conflict of Interest Policy.   Archstone's Motion at ¶ 9 and Exhibit I, p. 2-3.   Plaintiff denied the misconduct, but acknowledged in writing on that document that she and another employee may have engaged in conduct that created the appearance of a conflict of interest, itself a violation of Archstone's rules.   *Id.,* Exhibit I; *see also* Exhibit B at p. 111-114.   Ms. Lynch testified that she thought the conduct would be a serious problem if repeated.   Exhibit B at p. 215.

Three months later, in January 2008, Assistant Community Manager Lori Lanham criticized Plaintiff for improperly cancelling leasing entries and for being insubordinate when confronted with the error.   Archstone's Motion, Exhibit I, p. 4-5.    Plaintiff did dispute Ms. Lanham's characterization of her paperwork errors, and Ms. Lanham noted "we have agreed to disagree!"   *Id.*   Plaintiff's performance evaluation, however, completed only two months earlier, noted that she was "struggling with the paperwork" and gave her a "Learning Curve" rating,

---

[5] Plaintiff's Declaration, in particular, should be given no weight whatsoever.   The 4th Circuit has long held that "[S]elf-serving statements in affidavits without factual support in the record carry no weight on summary judgment." *Jiggets v. Long*, 2013 U.S. App. LEXIS 3800, *23-24 (4th Cir. February 22, 2013) (Citing *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004); *Jeandron v. Bd. of Regents of the Univ. Sys. of Md.*, No. 12-1724, 2013 U.S. App. LEXIS 3316, *13 (4th Cir. February 14, 2013); *see also Malghan v. Evans*, No. 04-1120, 118 Fed. Appx. 731, 733 (4th Cir. August 30, 2004) (a plaintiff's self-serving and conclusory affidavit is insufficient as a matter of law to counter substantial evidence of legitimate, non-discriminatory reasons for an adverse employment action and to stave off summary judgment).   Archstone has filed a Motion to Strike portions of the Declaration that are inconsistent with her prior sworn testimony.

lower than "Meets Expectations" rating in this area.  *See Id.*, Exhibit H.

Two weeks later, Leasing Supervisor Tia Snead issued Plaintiff another disciplinary warning, not for taking bereavement leave, as Plaintiff now suggests, but for failing to follow Archstone policy in requesting such leave.  Plaintiff was also disciplined for taking sick leave without providing acceptable documentation.  *Compare* Opposition at 21 with Archstone's Motion, Exhibit I, pp. 6-7.  Each disciplinary action notice issued to Plaintiff stated that future infractions could lead to termination.  Archstone's Motion, Exhibit H.  Plaintiff now portrays Archstone as having admitted that there was "nothing" wrong with Plaintiff "taking bereavement leave in the manner in which she did."  Opposition at 21.  This assertion is demonstrably false, as it contradicts both the written document, indicating that Ms. Snead was going to monitor Plaintiff's compliance with the attendance policy, and Ms. Lynch's testimony that Archstone did not dispute Plaintiff's eligibility for bereavement leave, but her failure to follow company policy in requesting that leave.[6]  Exhibit B at 224-225.  Moreover, as noted, Ms. Snead also criticized Plaintiff for failing to produce a doctor's note excusing her from work on two days in early January.  Archstone's Motion Exhibit I at p. 6-7.  Finally, Plaintiff was criticized for "multiple punches" of her time card while she was supposed to be taking a lunch break.  *Id*.  Plaintiff suggested at the time that some of those multiple punches were made at the request of a supervisor, but nothing about the counseling record suggests that Plaintiff's version of these events was accepted. Plaintiff now alleges that her multiple punches actually benefited

---

[6] Ms. Lynch was asked:
 Q. What was the problem with Miss Hop- -- Miss McCallum verbally notifying her supervisor on December 21st for leave that she needed on December 22nd or December 23rd?
 A. For scheduling purposes, the -- if you're going to be calling out, they want as much notice as possible….
Q. Okay. But with respect to the bereavement leave –
A. Itself?
Q. -- what did Aieda McCallum do wrong?
A. Nothing.
Exhibit B, Lynch Dep. at 224 - 225.

Archstone, and were evidence of positive behavior.   Opposition at 21.   Archstone's witness agreed that if Plaintiff's explanation were true, her behavior might be viewed as positive, but also stated that Archstone had no reason to believe that Plaintiff's explanation was accurate; rather, Plaintiff's explanation of what occurred was "just one side of it."   Exhibit B at 227-228.

In short, Plaintiff's dramatic assertion that Archstone lacked any basis to counsel her for these behaviors rests on nothing but bald assertions that she did not actually engage in the conduct referenced, or that because she did not intend to violate policy, she should not be held responsible for her failure to meet Archstone's policy expectations.   But it is the employer, and not the employee, that sets performance expectations. *See Afande v. Nat'l Lutheran Home for the Aged*, 868 F. Supp. 795, 802 (D. Md. 1994), affirmed 69 F.3d, 32 (4th Cir. 1995) (*quoting Palucki v. Sears, Roebuck & Co*., 879 F.2d 1568, 1571 (7th Cir. 1989) ("The employee doesn't get to write his own job description. An employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds….").

After Leisa Wolfe took over as Community Manager in March 2008, Archstone documented an additional six times Plaintiff failed to abide by its rules.   Plaintiff now argues that each of these infractions was minor, and not evidence of poor performance.   Opposition at 27. Although Plaintiff may have perceived her errors as minor, Plaintiff nevertheless *admitted* to committing each and every work rule violation that Ms. Wolfe accused her of.   Plaintiff admits she was tardy on two separate occasions after Ms. Wolfe notified her and all other Leasing Associates that she would not tolerate unexcused absences and tardiness.   *Id.* at 11-12.   Plaintiff also admitted that on June 8 she failed to comply with Archstone's attendance policy when she called and left a message on an answering machine instead of contacting a supervisor directly to

let Archstone know she would be absent.[7]  *Id*. at 12.   Plaintiff also admitted, in her own handwriting, that she asked contractors to perform work at the site on projects that benefited her, despite that she was not authorized to do so and with the result that the contractors attended to her priorities in advance of other scheduled work.  *See* Exhibit I to Archstone's Motion, 9-10 and Exhibit B 202– 203.  Plaintiff's present-day suggestion that asking the contractors to work on her apartments was important to Archstone selfishly fails to recognize that others' previously scheduled work was no doubt also important.  *See* Plaintiff's Opposition, Exhibit B at 6.  More significantly, her Opposition's novel allegation that she asked for assistance from the contractors because she could not get a manager's attention is contradicted by her deposition testimony, in which she testified that she came upon the contractors outside an apartment and asked them if they were going to clean it. *Compare* Opposition at 14, and Plaintiff's Declaration attached thereto as Exhibit B with McCallum Dep., attached to Archstone's Motion as Exhibit E, at 202-203.  It also differs from the handwritten note she inscribed on her final disciplinary notice, which reads, "In the past I was told to tell the cleaners about the move-ins… I should have talked to Leticia but I took it upon myself to have them clean the apartments," and "I was very used to the old days (before Leisa arrived) we would make all the decisions and clean the apartments… I am very sorry I did not change and do what was asked by Leisa and the other managers."[8]  What

---

[7] Plaintiff argues that Ms. Wolfe's April 21, 2008 memorandum directing all of the Leasing Staff to abide by Archstone's tardiness and absenteeism rules was no more than a reminder, warned only that future violations could lead to discipline, not discharge, and therefore is not evidence that Archstone would have disciplined Plaintiff but for her pregnancy.  Opposition at 12-13.  At the same time, she acknowledges that Leasing Agent Melissa Simmons (who was not pregnant) was given a written warning after she came to work late on a single occasion after Leisa reminded them of the policy.  Opposition at 12.  Notably, Ms. Simmons claimed on the disciplinary action form that she had attempted to reach a supervisor earlier, but had been unable to do so.  Archstone did not withdraw her written warning or otherwise amend its criticism despite her contention.  In this, she and Plaintiff were treated similarly.

[8] Plaintiff testified:

A. I told her that -- okay. What I told [Ms. Wolfe] was that they were in front of the apartment when I was looking over the apartment. I asked if this apartment was on their schedule. That was the conversation we had. Did I stop them from going and cleaning the apartment, no but I did not tell them to clean up the apartment. I did speak to them

is more, Plaintiff cannot create a dispute of fact by contradicting her own prior sworn testimony. *See In Re: Family Dollar Litig.*, 637 F.3d 508, 2011 U.S. App. LEXIS 5800, at **9-11 (4th Cir. 2011) (disregarding the plaintiff's affidavit and relying on the testimony she gave in her deposition where she was examined at length).

The litany of revisionist excuses for misconduct Plaintiff acknowledged at the time it occurred continues throughout Plaintiff's Opposition.  Plaintiff admits that on June 28, 2008 she wore a blazer to work which did not fit her.  Opposition at 13.  Although she now denies that she replaced that jacket with another that also did not fit (Opposition at 14), two days after she was first counseled she hand-wrote a note on her termination paperwork admitting that although she purchased a new jacket as directed by her supervisor, that jacket still did not fit.  *See* Exhibit I, p. 10 to Archstone's Motion.  It appears that "with her team," Plaintiff continued to "do what she wants… and then apologize later."  *Id.*, Exhibit H.

Finally, and significantly, although Plaintiff denies acting intentionally, she did admit at the time of her termination that she entered false information into Archstone's MRI database system in connection with the internet lead contest.  *Id.*, Exhibit I at 8.  Plaintiff's claim that now, five years later, she has no idea whether she entered the incorrect information and that she was under duress at the time she made that admission, is both convenient and unreliable.  *See* Plaintiff's Declaration, attached to her Opposition as Exhibit B, ¶13.  She also asserts that she was not asked about her role in the incident, although Archstone's investigation is described on the disciplinary action form, and Plaintiff did not dispute that representation of events at the time.  *Id.*  However, Archstone's contemporaneous documentation of its reasons for disciplining

---

directly. I spoke to them, but I did not tell them to clean up that apartment.
 Q. Well, why would you write on June 30th, I took it upon myself to have them take care of the apartments?
A. I did talk to them and I allowed them -- or I didn't stop them from doing it when they offered, so that was it.
McCallum Dep. at 202-203.

her, which she reviewed and signed, are the best record of what occurred at the time, particularly where, as here, Plaintiff's memories either contradict what she wrote then, or have been substantially embellished beyond what she recalled in her Interrogatory responses or during her deposition.   In any event, Plaintiff's Declaration to the contrary is against the weight of the evidence in the record and should be given no weight in evaluating Archstone's Motion for Summary Judgment. *Jiggets v. Long*, 2013 U.S. App. LEXIS at *23-24.

There is no dispute that Archstone's documented record of Plaintiff's performance shows multiple violations and performance failures that persisted despite repeated warnings and counseling by multiple supervisors, and that Plaintiff admitted to engaging in the majority of that conduct.  Regardless of Plaintiff's repeated assertions that she never *meant* to violate Archstone policy, no reasonable juror could find that Plaintiff's performance was meeting Archstone's legitimate expectations at the time of her termination.

**B.      Plaintiff's Pretext Evidence Is Based Entirely On Unsupported Speculation And Fails To Create A Triable Issue Of Fact.**

Plaintiff's assertion that she has stated a claim of discrimination and that a jury could conclude Archstone's legitimate nondiscriminatory reason for her termination is pretextual rests entirely on unsupported belief and speculation.   In support of her argument, Plaintiff suggests that: (1) the nexus in time between the announcement of her pregnancy and subsequent termination is suspect; (2) Plaintiff's supervisors responded negatively to her announcement that she was pregnant; (3) Plaintiff's disciplinary history is suspect; and (4) non-pregnant employees also violated Archstone policy but were not terminated.  None of these assertions survive scrutiny, as none are supported by the record evidence.

**1.      The Short Time Between Plaintiff's Announcement Of Her Pregnancy And Her Subsequent Termination Do Not Reflect Discriminatory Animus.**

Plaintiff seeks to survive Archstone's Motion for Summary Judgment by arguing that the fact that she was terminated only two weeks after she announced her pregnancy supports her *prima facie* case or is indicative of discriminatory motive.  Opposition at 23.  Plaintiff is wrong. The law and the cases she cites do not support the proposition that timing alone can sustain a claim of discrimination.  Neither *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006), nor *Fink v. Richmond,* CA DKC 2007-0714, 2008 WL 9364730 (D. Md. March 24, 2008) are instructive on this point.  *Asmo* is a Sixth Circuit case that addresses the elements of a *prima facie* case of discrimination in connection with a non-performance-based reduction in force, and stands for the position that in the Sixth Circuit, temporal proximity can help state a *prima facie* case of pregnancy discrimination in those cases where performance is not at issue.  *Fink* is an unreported decision from the District of Maryland, and also focuses its analysis on temporal proximity and causation, but in a retaliation case.  Neither *Asmo* or *Fink* are relevant to establishing a Plaintiff's *prima facie* case of discrimination where performance is in issue.

Plaintiff's claim that the limited time between the announcement of her pregnancy and her termination is also indicative of pretext fares no better.  Opposition at 23.  Plaintiff cites several cases in support of her argument; however, only one case, *Canavan v. Rita Ann Distributors*, CCB-03-3466, 2005 U.S. Dist. LEXIS 4582 (D. Md. Mar. 23, 2005) is from this Circuit.  *Canavan* is easily distinguishable on its facts.  In that case, the plaintiff was recognized as one of the company's top performers, had no disciplinary history, and was summarily terminated from her employment one week after she announced her pregnancy.  2005 U.S. Dist. Lexis at *5.  Ms. Canavan was therefore not similarly situated to Plaintiff, who struggled with performance throughout her employment with Archstone both before and after she announced her pregnancy.  The court recognized that although temporal proximity of a protected activity to

an adverse employment action is a consideration in pretext cases arising in this district, timing "is merely a factor, and alone is not sufficient to establish pretext." *Riddick*, 2010 U.S. Dist. Lexis at *17.

*Riddick* is instructive here.   In that case, the plaintiff, like Ms. McCallum, failed to introduce any direct evidence in support of her pregnancy discrimination claim and sought to rely on the temporal proximity of her pregnancy to her termination as a means to avoid summary judgment. *Id.*   This Court granted the employer's motion for summary judgment, holding that temporal proximity could not establish pretext where Riddick's poor performance predated her announcement that she was pregnant. *Riddick*, 2010 U.S. Dist. Lexis at *18.   The Court went further by stating that even had the plaintiff's poor performance begun *after* her announcement, temporal proximity alone could not establish that the employer's proffered nondiscriminatory motive was pretextual. *Id.*   Here, Plaintiff's proclivity to ignore Archstone policy was well-documented months prior to the announcement of her pregnancy.

More significantly, Archstone's Marketing Department (through an employee who worked in another location, and would have no notice of her pregnancy) launched an investigation into Plaintiff's claim that she had responded to an Internet lead just three days after she announced her pregnancy, an investigation that led to the conclusion that she had been untruthful about her actions.   *See* Exhibit A at 62-63, 65-66, 84-88; *see also* Opposition at Exhibit M.   Given that Archstone's investigation into suspected misconduct was contemporaneous with the announcement of Plaintiff's pregnancy, the temporal proximity of her termination to that announcement is not evidence that Archstone's proffered nondiscriminatory reasons for its actions are pretextual and a cover for intentional discrimination.

13.

2.    **Plaintiff's Newly Recalled and Unsubstantiated Perceptions of Ms. Wolfe and Ms. Taylor's Reaction To Her Pregnancy Announcement Are Irrelevant.**

Plaintiff next argues the Court should deny Archstone's Motion because Ms. Wolfe and Ms. Taylor allegedly "glowered" and failed to congratulate her when she announced her pregnancy. Opposition at 24. These allegations are entirely new, inconsistent with her sworn deposition testimony, and unsupported by the overall record. Moreover, even if Ms. Taylor was sensitive to her pregnancy, Plaintiff admits that Ms. Taylor played no part in the decision to discipline or terminate her from employment.

Ms. Wolfe's alleged "negative reaction" to Plaintiff's announcement of her pregnancy is not evidence of discriminatory animus. Nor is Plaintiff's perception that her managers stopped meeting with her because of her pregnancy probative, particularly where, as here, Plaintiff testified that her managers held no group staff meetings during the two-week period before her termination. This Court has recognized, reviewing similar facts, that these sorts of allegations are insufficient to establish pretext. In *Mench v. E. Savings Bank*, 949 F. Supp. 1236, 1239 (D. Md. 1997), the plaintiff asserted that her pregnancy announcement met with a lukewarm reception, after which her supervisors excluded her from meetings and became unavailable. Reviewing the evidence in the light most favorable to the plaintiff, the Court concluded that her impressions were ephemeral in nature and based solely on her own beliefs, opinions and uncorroborated factual assertions, and therefore, not entitled to much weight. *Id.* at 1239.

Plaintiff, for the first time in more than five years, has submitted a sworn declaration that asserts that her supervisors Leisa Wolfe and Leticia Taylor "glowered" and failed to congratulate her on her pregnancy when she announced it at the end of a staff meeting. Plaintiff's Declaration, Opposition Exhibit B, ¶ 13. That assertion appears nowhere in her correspondence

with the Equal Employment Opportunity Commission, her Complaint initiating this case, or even in the testimony she provided at a full-day deposition taken in early 2013.  Similarly, Plaintiff's Declaration contains the first assertion that Ms. Wolfe, a longtime smoker, resumed smoking outside the building after Plaintiff announced her pregnancy in order to monitor Plaintiff's performance.  In fact, in her deposition, Plaintiff testified that Ms. Wolfe had given up smoking a few weeks prior to her announcement, at the time the Archstone property was designated smoke-free, but that after she announced her pregnancy, she noticed that Ms. Wolfe had resumed smoking.  Plaintiff further testified that she felt harassed because Ms. Wolfe appeared to leave her office to smoke in the parking lot whenever she had to take a tour nearby and she would walk into clouds of smoke.  Exhibit A at 211 – 212.  Not only are Plaintiff's allegations based solely on her own beliefs, opinions, and uncorroborated factual assertions, the suggestion that Ms. Wolfe was monitoring Plaintiff to see if she would make a mistake appears to have been manufactured only in response to Archstone's Motion for Summary Judgment.  As such, they are no evidence of pretext whatsoever.

Plaintiff also argues that Ms. Taylor treated her unfairly on the basis of her pregnancy. In one instance Ms. Taylor allegedly asked Plaintiff why it had taken her so long to complete an errand and stated that she was concerned that Plaintiff had been gone so long that she might have fainted, presumably because of her pregnancy.  Archstone's Motion, Exhibit E at 199.  In the second, Ms. Taylor allegedly asked Plaintiff whether she thought it was "wise" to confront visitors after Plaintiff followed an uninvited visitor who brushed past her to enter the property unescorted.  *Id.* at 204.  Despite Plaintiff's newly asserted belief that Ms. Taylor was being "snide" in questioning whether it was wise for her to approach any visitor to offer tour of the premises (Opposition at 24), it is clear that Ms. Taylor's motives were at the least solicitous of

Plaintiff's condition.[9]

Ultimately, whether the comments were concerned or snide is of no consequence because Plaintiff has admitted that Ms. Taylor never altered Plaintiff's job duties as a result of her pregnancy. *Id.*, Exhibit E, at 199 – 200, 203. Significantly, it is also undisputed that Ms. Taylor played no role in bringing Plaintiff's policy violations to Ms. Wolfe's attention, and was not involved in the termination meeting. *Id.* Ms. Taylor's alleged concerns notwithstanding, the record evidence demonstrates she played no role in any disciplinary decision taken after Plaintiff announced her pregnancy. As such, Ms. Taylor's conduct is not indicative that Archstone's asserted nondiscriminatory reason for its decision to terminate Plaintiff's employment is pretextual.

Plaintiff's reliance on case law from outside this Circuit to support her claim that her managers' hostility can be evidence of pretext is also distinguishable. In *Asmo,* the Court agreed that a plaintiff had produced evidence of discriminatory animus when her supervisor not only failed to congratulate an employee on her pregnancy, but also failed to acknowledge her pregnancy in any way, including refusing to discuss the employer's maternity leave plan with her and refusing to discuss how the employee's pregnancy would affect her job duties which required a significant amount of travel. Neither Ms. Wolfe nor Ms. Taylor is alleged to have refused to acknowledge Ms. McCallum's pregnancy altogether, and Ms. Taylor made solicitous comments regarding Plaintiff's health and safety during her pregnancy. Plaintiff's reliance on *Troupe v. Lord & Taylor*, 20 F.3d 734 (7th Cir. 1994) is similarly unconvincing. The language on which Plaintiff's relies is dicta, and the case itself contains no facts similar to this one, except that the plaintiff was pregnant. In any event, those cases are not controlling in this Circuit.

---

[9] Plaintiff never referred to Ms. Taylor or Ms. Wolfe's treatment of her as "snide" in any record evidence, nor in her Complaint, not in her communications with the EEOC, and not in her deposition. Once again, this allegation appears to have been manufactured solely in response to Archstone's Motion.

Accordingly, because Ms. McCallum can provide no corroborated evidence to support her contention that her supervisors had a negative reaction to her pregnancy, this argument also fails.

### 1. Archstone's Termination Decision Is Not Suspect.

Grasping at straws, Plaintiff next claims that Archstone's proffered reasons for terminating her employer are pretextual because Ms. Wolfe failed to follow an Archstone policy requiring supervisors to discuss the basis for an employee's termination with that employee prior to the actual termination.  Opposition at 25.  Contrary to Ms. McCallum's claims, no such policy exists.  Regardless, the record evidence shows that Ms. Wolfe addressed Ms. McCallum's disciplinary issues with her prior to her separation from employment.

Plaintiff relies on select testimony from Ms. Lynch's deposition to concoct a formal Archstone termination policy.[10]  *Id.*  Plaintiff claims, based on Ms. Lynch's statement that "before we actually terminate an associate, we would have talked to them about the situation," Ms. Wolfe violated Company policy because she did not discuss her concerns with Plaintiff's performance with Plaintiff prior to drafting the termination document.  Opposition at 26.  Had Plaintiff accurately quoted Ms. Lynch, it would be clear that although typically managers have a discussion with the employee before terminating them, sometimes those discussions happen "a day or two in advance, and sometimes the termination document is already prepared" and the conversation happens contemporaneously with the termination meeting.  Exhibit B at 244.

---

[10] Plaintiff suggests that Ms. Lynch's testimony regarding Archstone's decision to terminate Ms. Wolfe is not entitled to deference as Ms. Lynch has no first-hand knowledge of the events leading to the termination.  This argument is specious.  Ms. Lynch was deposed as a 30(b)(6) corporate witness.  Rule 30(b)(6) charges the organization to designate a witness to testify about information known or reasonably available to the organization and does not contemplate first-hand knowledge of the deponent.  *See Wilson v. Lurker*, 2005 U.S. Dist. Lexis 11019, *12 (April 28, 2005 D. Md.) (a 30(b)(6) deponent is require to testify to matters known, or reasonably known, to the organization, and is not required to have personal knowledge of those matters).   To the extent Plaintiff's alleges Archstone "failed to produce" Leisa Wolfe, Plaintiff similarly made no effort to depose Ms. Wolfe.  Thus no conclusion needs to be drawn from Ms. Wolfe's unavailability.

Regardless, the record evidence establishes that Ms. Wolfe did in fact discuss Plaintiff's performance shortcomings with her both prior to, and on the day of, her termination.   For example, the final disciplinary notice states that Archstone approached Plaintiff after learning Plaintiff had entered inaccurate data into the MRI system, and asked Plaintiff for evidence that she had in fact responded to the leasing inquiry by e-mail.   The document reads, "When approached, Aieda was unable to provide any additional documentary support to this lead." *Id.,* Exhibit I at 10.   Moreover, Ms. Wolfe testified under oath at an unemployment compensation hearing that "I did the research and made sure everything was correct and I did discuss it with Aieda" and "I gave her the opportunity to explain what the process was to respond, to follow up [on the lead], and she was unable to give a response."   *See* Audio Recording of Archstone/Hopkins Unemployment Appeals Hearing, attached hereto as Exhibit C.[11]   In an effort to suggest pretext, Plaintiff asks the Court to believe instead that *Archstone* falsified its investigation into her error, and that no such investigation ever occurred.   Opposition at 16. Plaintiff now asks the Court to consider Archstone's contemporaneous written evidence and sworn testimony evidence of pretext, in fact part of an elaborate ruse designed to mask intentional pregnancy discrimination.   Plaintiff's allegation is specious and unworthy of credence, particularly in light of the fact that after reviewing Archstone's summary of the event in her termination documentation, Plaintiff wrote a note that not only failed to object to Ms. Wolfe's written assertion that she conducted an investigation, but also admitted her guilt, stating "I mistakenly messed up the MRI lead."   Archstone's Motion, Exhibit I at 10.   The only dispute of fact, therefore, is whether Plaintiff acted intentionally or not when she "messed up" the lead.

---

[11] Plaintiff is moreover well aware of Ms. Wolfe's sworn testimony, as she attended the unemployment appeal hearing, and provided an audio transcript of that hearing in response to Archstone's request for production of documents.  At best, then, Plaintiff can claim only that there is a dispute of fact as to whether Archstone investigated her alleged misconduct.

Inasmuch as Plaintiff repeatedly admitted engaging in the policy violations she was counseled about, while simultaneously denying any intent to violate Archstone's rules, it is neither surprising nor convincing that Plaintiff denies she intentionally falsified the record.  Even if she had acted unintentionally, *nothing* in the record evidence suggests that Archstone's conclusion that she had falsified data was "plainly false," as Plaintiff now asserts (without evidentiary support).  Opposition at 27.  Archstone measured not only the number of leads each Leasing consultant responded to, but also the time it took them to respond, so although it would benefit Plaintiff financially to respond to as many leads as possible, Plaintiff may also have had a motive to document she had responded promptly.  *See* Archstone's Motion, Exhibit K. Like the "boy who cried 'wolf,'" perhaps Plaintiff had relied once too often on her go-to excuse that she simply made a mistake, and Archstone concluded it could no longer trust her.

Plaintiff also admits that Ms. Wolfe also put her on notice regarding her dress code violations two days prior to her termination.  Opposition at 13.  Indeed, on June 28, two days prior to Ms. McCallum's termination, Ms. Wolfe advised Plaintiff that her suit jacket did not fit and directed her to return with one that could button in the front.  *Id.*  Plaintiff admitted on June 30 that her new jacket did not fit, and cannot create an issue of fact by contradicting that writing now.  *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997) ("[A] genuine issue of material fact is not created where the only issue is to determine which of the two conflicting versions of the plaintiff's testimony is correct.")  Moreover, she was well aware of Archstone's dress code expectations.  And she has not testified that she was unable to find properly fitting garb because of her pregnancy.  Although Plaintiff and Archstone dispute whether Ms. Wolfe ever told her to "cover up that baby belly," the fact that Plaintiff had in fact failed to follow the dress code is not in dispute.

Finally, there is absolutely no evidence in the record to suggest that Archstone deviated from its normal human resources practices when it failed to research Plaintiff's complaint of pregnancy discrimination.   Archstone has no record of Plaintiff complaining of pregnancy discrimination before September 2009.   Exhibit B to Archstone's Motion.   Although Plaintiff now asserts that she did, in fact, complain of discrimination shortly after her termination, her sworn testimony before the Unemployment Appeals examiner only states that "I told [Ms. Wolfe] that I thought the measures were a bit extreme," and that when she spoke to Ms. Levix shortly thereafter, Ms. Levix stated that she stood by the decision to terminate.   *See* Exhibit C. Again, Plaintiff cannot create a dispute of fact by forcing the court to determine which of two versions of her testimony is correct.   *Halperin*, 128 F.3d at 198.   Accordingly, Archstone's process of moving forward with Plaintiff's termination in no way gives rise to an inference of discrimination.

## 2. Plaintiff Cannot Demonstrate that Archstone Treated Non-Pregnant Comparators Better than Plaintiff.

In a final effort to save her case, Plaintiff alleges that Archstone treated two non-pregnant employees, Tia Snead and Letitia Taylor, more favorably than Plaintiff.   Unfortunately for Ms. McCallum, neither employee is a proper comparator.   Indeed, the similarity or job descriptions between comparators and the seriousness of their respective offenses must be clearly established in order to successfully establish a comparator relationship.   *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).   Neither has been established here.

First, Ms. Snead's disciplinary history is not sufficiently similar to that of Plaintiff.   Ms. Snead was disciplined in February 2011, three years after Ms. McCallum was terminated from her employment.   Plaintiff's Opposition, Exhibit L.   Second, the disciplinary action was issued by a community manager other than Leisa Wolfe, at a facility other than Westchester at Cherry

Lane.  *Id.*  Third, Ms. Snead was disciplined for failing a mystery shop and not for falsifying

leasing data.  *Id.*  Forth, Ms. Snead also did not have as many individual disciplinary actions and

the same amount of time as Plaintiffs.  *Id.*  Accordingly, she is not a proper comparator.

Ms. Taylor similarly is not a comparator of Ms. McCallum, insofar as she was Ms.

McCallum's immediate supervisor.   Plaintiff makes much of the fact that all Archstone

employees, including senior management employees, are subject to the same code of conduct.

Plaintiff's Opposition at 13.   According to Plaintiff, because all employees are subject to the

code of conduct, each and every employee at Archstone was Ms. McCallum's comparator.  *Id.*

Plaintiff has no choice but to make this argument since the comparator that Plaintiff identified in

her Complaint, Melissa Simmons, also was terminated by Ms. Wolfe (two weeks prior to

Plaintiff) for a series of similar "minor" rules infractions, including tardiness, dress code

violations, and improper use of the Company's email system.[12]  Plaintiff's other comparator,

Tony Williams, was terminated by Ms. Wolfe a few weeks after Plaintiff, for falsification of

Archstone documents.  Unfortunately for Plaintiff, her theory that all employees covered by the

same disciplinary code are must therefore be comparators simply is not supported by case law in

the Fourth Circuit.  *See Lightner*, 545 F.3d at 265 (holding that a comparison of two police officers

was not sufficient because only one held a commander position); *see also Lauture v. St. Agnes Hosp.*,

Civil Action No. CCB-08-943, 2009 U.S. Dist. LEXIS 120707, *17 (D. Md. Dec. 29, 2009)

(comparing of plaintiff against other employees in her laboratory was not sufficient because the

alleged comparators had different job duties than plaintiff).

---

[12] In her Opposition, Plaintiff argues Ms. Simmons received favorable treatment because after arriving one hour late to work on May 7, she was not terminated.  Admittedly, Simmons was not terminated for a single instance of tardiness, but neither was Plaintiff.  In fact, Ms. Simmons was terminated two weeks prior to Plaintiff after engaging in another violation of work rules.  Archstone's Motion at Exhibit L.  And, it is undisputed that Ms. Wolfe, the alleged discriminator, successfully managed two other leasing agents through their pregnancies and subsequent maternity leaves without incident.  *See* Archstone's Supplemental Responses to Plaintiff's Interrogatories, attached hereto as Exhibit D.

Even were Ms. Taylor a proper comparator, Archstone's decision to place her on a final written warning rather than to terminate her for failing to manage the leasing paperwork does not evidence pretext, because, unlike Plaintiff, this was Ms. Taylor's first documented disciplinary action.  Plaintiff, on the other hand, had received four separate documented discipline actions prior to the one issued by Ms. Wolfe on June 30.  In this her treatment was no different, and in some ways more generous, than Archstone's final written warning to Ms. Taylor.

Thus, Plaintiff has failed to point to an issue of fact upon which a reasonable juror could conclude that Archstone's stated reasons for terminating Plaintiff employment were pretext for pregnancy discrimination.

## II.    CONCLUSION

For the reasons stated herein, and further stated in Defendant's Motion, Defendant respectfully asks the Court to grant its Motion for Summary Judgment and enter judgment in its favor.

Respectfully submitted,

/s/ Nancy N. Delogu
Nancy N. Delogu (Bar No. 17504)
Jennifer W. Thomas (Bar No. 18444)
LITTLER MENDELSON, P.C.
1150 17th Street N.W.
Suite 900
Washington, DC  20036
202.843.3400 direct
202.318.8942 fax
NNDelogu@littler.com
JWThomas@littler.com

Counsel for Defendant
June 24, 2013                                    Archstone Communities LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2013, the forgoing Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment was served with the Clerk of Court using CM/ECF, who will then send a notification of such filing to the following:

Richard A. Salzman
Susan E. Huhta
Heller Huron Chertkof Lerner Simon and Salzman
1730 M St NW
Suite 412
Washington, DC 20036

Matthew Keith Handley
Washington Lawyers Committee for Civil Rights and Urban Affairs
11 Dupont Cir NW
Suite 400
Washington, DC 20036

*/s/ Jennifer W. Thomas*
Jennifer W. Thomas

23.