**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

AIEDA MCCALLUM                                          :
                                                        :
                                                        :
     v.                        :                    Civil No. JFM-12-01529
                                                        :
                                                        :
ARCHSTONE COMMUNITIES LLC                               :
                                                        :

## MEMORANDUM

    Plaintiff Aieda McCallum[1] brings this suit against defendant, Archstone Communities

LLC ("Archstone"), her former employer, for alleged pregnancy discrimination in violation of

Title VII of the Civil Rights Act of 1991 ("Title VII"), 42 U.S.C. § 2000e et seq.  Archstone now

moves for summary judgment.  The parties have fully briefed the issues, and no oral argument is

necessary.  *See* Local R. 105.6.  For the reasons set forth below, the motion is denied.

## BACKGROUND

    This court must "view the facts and draw reasonable inferences in the light most

favorable to the party opposing the summary judgment motion."  *Scott v. Harris*, 550 U.S. 372,

378 (2007) (internal quotation marks and alterations omitted).  During the relevant period,

Archstone owned and operated several apartment communities located in the Washington, D.C.

metropolitan area.  In March 2007, Archstone hired McCallum to be a Resident Concierge, an

---

[1]     Plaintiff married and changed her name to Aieda McCallum after her employment with
Archstone ended.  All Archstone documentation of plaintiff's employment refers to her as Aieda
Hopkins.  The parties refer to plaintiff as McCallum throughout their memoranda and citations to
her employment history.  Therefore, the court will also refer to plaintiff as McCallum despite the
references to her former name in the employment history.

entry-level position, at its Connecticut Avenue property in Washington, D.C. Shortly thereafter, McCallum transferred to Archstone's facility in Bowie, Maryland, and later, she transferred to the Archstone facility in Laurel, Maryland, called Westchester at Cherry Lane. When McCallum arrived at Westchester at Cherry Lane, the property had no residents, so she assisted with efforts to begin leasing the property's apartments. In August 2007, Duane Wooldridge, an Archstone Operations Manager, asked McCallum if she would like to accept a promotion to become a Leasing Consultant, and McCallum accepted. As a Leasing Consultant, McCallum worked with prospective residents to lease apartments, recorded information about prospective residents in Archstone's database, and responded to inquiries and requests from current residents.

McCallum was never a perfect employee during her time at Archstone. On November 30, 2007, McCallum received a formal performance appraisal, the only one she received during her tenure at Archstone, and it was representative of her uneven performance over the course of the roughly fifteen months that she worked there. On the one hand, the appraisal highlighted McCallum's strengths as a Leasing Consultant, calling her "a great communicator," "dynamite," and "a defender and provider for the residents." (ECF No. 21-9.) On the other hand, the review recognized some of McCallum's shortcomings. The appraisal stated that she had "times when she [did] not consider accuracy and neatness with her leasing paperwork," she struggled with following attendance rules, she had "some issues with properly fitting jackets and shirts," she had trouble multitasking, she was not genuine with her coworkers and prospective residents, and she did not always work well with others because she "[did] what she want[ed] to do then apologize[d] later for it." (ECF No. 21-9.) The appraisal also noted that, as of November 2007, McCallum led the office in leases but also led in the number of people who cancelled their plans

to move in to the property.  In spite of these critiques of McCallum's performance, the evaluator

gave her an overall evaluation of "Meets Expectations," concluding that McCallum was a

"strong Leasing Consultant" who nonetheless needed to improve in certain areas.  (ECF No. 21-

9.)[2]  When she received this evaluation, McCallum wrote that she "[felt] most of my evaluation

[was] accurate."  (ECF No. 21-9.)

     McCallum's day-to-day existence as an Archstone Leasing Consultant was similarly

mixed—on some days, she received praise, on others, criticism.  According to McCallum, she

was regularly told she was doing well in her position from the various individuals who

supervised her between August 2007 and June 2008.  In one specific instance from September

2007, Wooldridge, who was McCallum's supervisor at the time, responded to a new tenant who

had written a complimentary email about McCallum.  Wooldridge's reply email stated he and

others at Archstone had also been "impressed with [McCallum's] ability to make people feel at

home with her sincere customer service approach."  (ECF No. 26-4.)  McCallum also recalled

an instance when Leisa Wolfe, who was her supervisor beginning in March 2008, took time out

of a staff meeting to read aloud an email from a satisfied resident complimenting McCallum's

hard work.  Wolfe then said, again in front of the staff, "she was proud of the work that

---

[2]     The appraisal broke down McCallum's performance into nine discreet categories,
offering an individual evaluation and feedback for each category.  Even where McCallum had
significant room for improvement, she did not receive an evaluation for any individual category
lower than "Learning Curve," which Archstone defined as "inconsistently meet[ing]
expectations" and requiring "more experience and/or training," instead of the lowest rating of
"Marginal Performance," defined as "not meet[ing] minimum expectations" and "requir[ing]
immediate improvement."  (ECF 21-9.)  At the same time, McCallum received a rating of
"Exceeds Expectations" in one category, defined as "exceed[ing] expectations for the position"
and "consistently perform[ing] at or above expectations."  She did not receive the highest rating
of "Top Achiever" in any individual category.

[McCallum] was doing" and told her to keep up the effort.  (McCallum Dep. 126:9–18, ECF No. 26-1.)

The instances when McCallum was criticized for her performance are more specific and numerous.  From August 2007 until June 2008, McCallum received four disciplinary notices from various supervisors, some of which noted multiple violations of company policy.  In each case, the disciplinary notice was a "Verbal Counseling," which is the least severe recorded disciplinary notice given to Archstone employees.  But each of these records also included the following warning: "If performance or conduct is not corrected to an acceptable level or if other unacceptable performance or conduct occurs, further corrective action may be taken up to and including termination."  (*See, e.g.*, ECF No. 21-10 at 2.)  McCallum received a verbal counseling on August 30, 2007 for violating Archstone's uniform policy (ECF No. 21-10 at 2); a verbal counseling on October 16 for creating the appearance of a conflict of interest by fraternizing with a current resident (ECF No. 21-10 at 3); a verbal counseling on January 7, 2008 for improperly cancelling lease entries, showing a "complete disregard" for her training, and walking away from and otherwise reacting in a nonchalant way to her supervisor's critique (ECF No. 21-10 at 5); and finally, a verbal counseling on January 18 for a "pattern of unexcused absences" and other violations of Archstone's attendance policy over the course of the prior month (ECF No. 21-10 at 7).  In some instances, the verbal counseling indicated only that McCallum would be monitored by supervisors or restated Archstone's expectations of her.  The January 7 counseling stands out for its emphasis on the urgent need for improvement.  Lori Lanham, McCallum's then-supervisor, wrote that McCallum needed to make immediate improvements because there had been "ample time to make these adjustments" and she had

4

already received the proper training. (ECF No. 21-10 at 5.) But after January 18, McCallum did not receive any other documented disciplinary notice—verbal counseling, written counseling, probation, or suspension—until she was terminated on June 30, 2008.

Leisa Wolfe became the community manager at Westchester at Cherry Lane in March 2008. On April 21, 2008, Wolfe held a meeting with staff at the property and wrote an email giving the staff a "final warning" regarding violations of Archstone's attendance policy. (ECF No. 21-11.) Future violations of the policy, Wolfe wrote, would lead to immediate "written documentation." She requested that all employees at the property sign the attendance policy again, which McCallum did that day.

On June 15, McCallum informed her colleagues that she was pregnant with twins. After her announcement, McCallum alleges that Wolfe and Leticia Taylor, the Assistant Community Manager, exchanged disapproving looks, seemed upset by the news, and did not congratulate her on her pregnancy. (McCallum Decl. ¶ 6, ECF No. 26-2.) According to McCallum, after the pregnancy announcement, Wolfe began to shun her, stopped holding regular morning meetings with her, and changed her smoking habits to time her breaks in order to follow and observe McCallum as she carried out her duties. (McCallum Decl. ¶ 7–9.) McCallum alleges that Taylor also became less accessible after her announcement.

Beyond these general impressions of a change in attitude, McCallum recalls several specific instances when her supervisors treated her differently after the pregnancy announcement. On June 28, two days before she was fired, McCallum claims that Wolfe approached her and told her that her jacket did not fit properly and that she needed to acquire a new one to comply with Archstone's uniform policy. But during this interaction, McCallum

also claims that Wolfe said "cover up that baby belly" and patted her stomach. (McCallum Dep. 182:15–183:21, 186:7–9.) Additionally, on some unspecified date after the pregnancy announcement but before her termination, McCallum claims that Taylor expressed concern that McCallum had taken longer than usual to inspect an apartment, and Taylor was worried that McCallum had fainted during the inspection. (McCallum Dep. 199:4–21.) McCallum claims she told Taylor she was treating her differently because of her pregnancy, but Taylor had no response. Later, according to McCallum, Taylor asked her if she thought it was wise to approach visitors in her "condition" after an incident in which a visitor ignored her direction that he could not enter Westchester at Cherry Lane unless she gave him a tour. (McCallum Dep. 205:11–13.) McCallum understood Taylor's alleged reference to her "condition" to mean her pregnancy.

On June 30, only two days after the alleged "baby belly" comment, Wolfe met with McCallum to inform her that she was fired effective immediately. The termination memorandum contained a litany of alleged violations of Archstone rules committed by McCallum over the course of more than two months. The memorandum first cited McCallum for reporting to work late on two occasions—on May 10, McCallum was twenty minutes late, and on June 7, she was fifteen minutes late. The memorandum also alleged that on June 8 McCallum failed to follow proper procedures for calling out of work, a violation of the Archstone attendance policies. Third and perhaps most importantly, the memorandum cited McCallum for falsifying company records. The memorandum explained that McCallum received an inquiry, or lead, that appeared to be sent by a prospective tenant but was actually a monitored and fake lead sent by Archstone's own marketing department. Although this

monitored lead contained no phone number in the contact information section, Archstone

discovered an entry in its database made by McCallum noting that she had left a voicemail in

response to the lead. (ECF No. 21-12 at 4.) According to the termination memorandum,

McCallum was "approached" about the discrepancy but was "unable to provide any additional

documentary support to this lead." (ECF No. 21-10 at 9.) The memorandum cited an additional

violation, this time regarding McCallum's uniform. According to the memorandum, Wolfe told

McCallum on June 28 her jacket did not fit, and she needed to purchase a new jacket in order to

comply with the Archstone uniform policy.[3] The memorandum went on to say McCallum came

to work on June 30 with a jacket that still did not fit her properly, putting her in violation of the

uniform policy despite the warning from two days earlier. Finally, the memorandum cited

McCallum for making a direct request to cleaning contractors to add apartments to their

schedule in violation of Archstone policy.

McCallum offered her own written comments during the termination meeting. She

acknowledged that she "made a few mistakes." (ECF No. 21-10 at 10.) She claimed the reason

she approached the cleaning contractors directly was because she could not communicate with

Taylor in time to set up the cleaning schedule for her apartments, but acknowledged that she

should have spoken with Taylor. She also explained that she did buy a new jacket and did not

purposefully buy a wrong-fitting one. Finally, with regard to the falsification of records

accusation, she claimed she simply "mistakenly messed up" the lead and said she would "never

knowingly disrespect the company or its practices." (ECF No. 21-10 at 11.)

---

[3]     Although the memorandum makes no reference to it, this is the same interaction during
which McCallum alleges that Wolfe told her to "cover up that baby belly."

Since her termination, McCallum has offered more details about the termination meeting. McCallum now claims she told Wolfe she felt her termination was related to her pregnancy, and Wolfe responded by saying that had this concern been raised earlier, the termination decision may not have been made. (McCallum Dep. 180:14–22.) She also claims that Wolfe pressured her to admit her fault in the termination meeting and did not even give her an opportunity to review her own emails or documentation to defend against the falsification of records accusation. (McCallum Decl. ¶ 13, 18.) On July 1, McCallum claims she called Michele Levix, an Archstone human resources officer, and inquired about what recourse she could take to appeal the decision made by Wolfe. McCallum claims she told Levix about her concerns about pregnancy discrimination, but Levix told her she supported Wolfe's termination decision. (McCallum Dep. 261:16–263:4.) Archstone has no documentation of McCallum's contemporaneous complaints to either Wolfe or Levix regarding pregnancy discrimination, and consequently has no evidence of a contemporaneous investigation into possible discrimination. (Lynch Decl. ¶ 7, ECF No. 21-2.)

McCallum has also disputed several issues raised in the termination memorandum, the most important being her claim that she was never approached by Wolfe prior to the June 30 termination meeting about the falsification accusation. According to McCallum, the first she heard of this charge was June 30, notwithstanding the notation in the termination memorandum indicating she had been approached on an earlier date to get her side of the story. (McCallum Dep. 217:13–219:13.) For its part, Archstone has provided no record evidence or testimony that a meeting between Wolfe and McCallum took place except for very brief testimony by Wolfe from an audio recording of an unemployment benefits hearing. (ECF No. 29-3.) The only other

evidence relating to the alleged falsification of records is an email from Christina Hershey, an Archstone marketing employee, calling the questionable database entry to Wolfe's attention and asking her to investigate in order to "make sure a technical glitch did not occur." (ECF No. 21-12 at 2.) Archstone has provided no evidence about whether Wolfe responded to this email or discussed the issue further with Hershey.

McCallum filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC") in April 2009. Archstone investigated the complaint upon receiving notice of the EEOC charge, but it found no evidence of discrimination. (Lynch Decl. ¶ 6.) McCallum filed this suit on May 22, 2012.

## STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

## ANALYSIS

### A.     Contradictions Between Declaration, Deposition Testimony, and Answers to Interrogatories

Before proceeding to the merits of Archstone's motion for summary judgment, the court must address Archstone's motion to strike certain portions of McCallum's declaration submitted with her reply to Archstone's summary judgment motion. Archstone contends that the declaration contains two categories of statements that should be stricken: (1) statements that contradict McCallum's prior deposition testimony and interrogatory responses, and (2) statements that are conclusory and unsupported by record evidence.

It is well-settled that a party opposing summary judgment cannot create a factual dispute by identifying a conflict between sworn deposition testimony and a subsequent affidavit contradicting the prior testimony. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* at 513 (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)). Therefore,

courts should disregard assertions in affidavits that are inconsistent with prior testimony when deciding whether to grant summary judgment. *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 976 (4th Cir. 1990). But in order for this rule to apply, there must be a "bona fide inconsistency" between the earlier and later testimony, so courts must carefully examine whether the prior testimony is actually inconsistent with what was offered later. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001).

Here, Archstone has moved to strike several statements from McCallum's declaration on the basis that they contradict her deposition testimony or interrogatory responses. For most of these statements, however, the court concludes McCallum's declaration is entirely consistent with her deposition testimony or interrogatory responses.[4] Other statements identified by

---

[4]   Several statements fall into this category. For instance, Archstone claims that McCallum contradicted her prior testimony by including in her declaration an assertion that the tone used by Wolfe and Taylor was "hostile" after they learned of McCallum's pregnancy. (McCallum Decl. ¶ 7.) Just because the word hostile had not appeared in McCallum's prior testimony does not mean that it contradicts McCallum's story throughout this case, which has been that after announcing her pregnancy, Wolfe and Taylor appeared to avoid and shun her, and when they did interact, they were abrupt with her and did not assist her. (McCallum Dep. 196:3–20; McCallum Am. Resp. to Archstone Interrog. No. 5, ECF No. 34-2.) This description of what occurred after the pregnancy announcement is not inconsistent with a more concise description of their tone as "hostile."

Archstone also claims that McCallum's allegation that Wolfe timed her smoking breaks in order to observe McCallum contradicts her prior testimony on the same subject. (McCallum Decl. ¶ 9.) But McCallum previously alleged exactly that in her interrogatory response, stating that the smoke breaks appeared to be timed to give Wolfe "an excuse to observe" her. (McCallum Am. Resp. to Archstone Interrog. No. 8.) What's more, McCallum testified in her deposition that Wolfe began taking smoking breaks only after she learned of McCallum's pregnancy and these breaks coincided with McCallum leading tours outside. (McCallum Dep. 211:13–212:14.) The court will not consider McCallum's speculative conclusion that Wolfe took these breaks in order to look for a reason to document McCallum's mistakes because there is no evidence to support this beyond her bald assertion, but it is relevant to her narrative that Wolfe began changing her behavior as it related to McCallum only after learning of her pregnancy.

Archstone identifies another phantom inconsistency, this time with respect to

11

Archstone are not relevant to any important issue in this case.[5]

One statement that the court will not strike deserves greater attention because of the significance it has to the merits of McCallum's discrimination claim. In her declaration, McCallum stated that Wolfe and Taylor appeared to react negatively to the news of her pregnancy, exchanged disapproving glances, and failed to congratulate her on this news.

---

McCallum's assertion in her declaration that the reason her jacket did not fit on June 28 was her "showing" pregnancy. (McCallum Decl. ¶ 10.) In her declaration, McCallum also maintains that she thought her jacket otherwise fit. McCallum has consistently alleged her pregnancy was showing at the time she was terminated, (McCallum Dep. 187:9–188:1), and Wolfe told her to "cover up that baby belly." (McCallum Dep. 182:15–19.) She also testified in her deposition that she protested at the time that her termination was discriminatory because she was pregnant and was fired because her jacket did not "[cover] up [her] midsection." (McCallum Dep. 182:5–10.) Therefore, McCallum's declaration does not contradict her prior testimony on this point.

The final statement in this category relates to McCallum's explanation for why she violated the rule against directly communicating with cleaning contractors. In her declaration, McCallum claims she spoke directly to the cleaning contractors because Wolfe and Taylor "did not respond to her request" which is consistent with her claim that they "were not speaking to [her] at the time." (McCallum Decl. ¶ 15.) Archstone argues that this explanation is inconsistent with McCallum's prior deposition testimony, but as McCallum argues, Archstone fails to recognize that the deposition testimony on this issue goes to how McCallum approached the cleaning contractors and whether she directed them to clean certain apartments, not why she felt the need to do so in the first place. (McCallum Dep. 202:10–203:8.) In fact, McCallum's declaration is entirely consistent with her response to Archstone's interrogatory on the subject, in which she stated that Wolfe and Taylor "caused confusion" and "miscommunication" between McCallum and contractors by shunning her. (McCallum Am. Resp. to Archstone Interrog. No. 5.) And in her contemporaneous written comments provided during the termination meeting, McCallum wrote that she was unable to communicate with Taylor about setting up the cleaning schedule. (ECF No. 21-10 at 10.) Although a jury might discredit McCallum's testimony on this and other topics at trial because of these subtle variations in her story, Archstone has not identified a "bona fide inconsistency" that would justify striking these portions of McCallum's affidavit. Accordingly, these statements are not stricken.

[5]    For example, Archstone challenges the statement in McCallum's declaration that she honestly believed she was complying with the Archstone dress code at the time she received a verbal counseling in August 2007, (McCallum Decl. ¶ 20,) but that assertion is irrelevant to any issue of consequence in this case. What matters is that McCallum received a verbal counseling for this violation putting her on notice of Archstone's expectations for its employees' uniforms.

(McCallum Decl. ¶ 6.)  Archstone argues that the statement should be stricken because McCallum never mentioned this episode until now despite her numerous opportunities to raise it, including an interrogatory question encompassing the issue and further deposition questions based on her responses to the interrogatory.  The interrogatory in question directed McCallum to provide support for her claim that "immediately upon learning of Plaintiff's pregnancy, [Leisa] Wolfe and [Leticia] Taylor began to shun plaintiff, no longer held meetings with her, and refused to assist her with office matters."  (McCallum Resp. to Archstone Interrog. No. 5.)  McCallum's response to this interrogatory described how Wolfe and Taylor avoided her and reduced their level of interaction with her after the pregnancy announcement, but it made no reference to their alleged immediate negative reactions.  As McCallum argues, however, there is no "bona fide inconsistency" here.  Neither the interrogatory nor the deposition questions on this topic directly asked how Wolfe and Taylor *physically* reacted at the moment they learned of the pregnancy.  Instead, the questions focused on how Wolfe and Taylor "shunned" or avoided McCallum immediately *after this meeting*.  Thus, their immediate physical reaction *during the meeting* at the time they learned of the pregnancy was patently outside the scope of these questions.  *See Spriggs*, 242 F.3d at 186 n.7. (concluding that a statement in an affidavit should not have been stricken after finding that ambiguity in a deposition question explained why the employee mentioned a fact for the first time in the affidavit).  Accordingly, McCallum's statement in her declaration on this point is not stricken.

Archstone has identified one legitimate inconsistency between McCallum's declaration and her prior testimony.  In her declaration, McCallum claims that Wolfe "pressure[d]" her to admit fault for the alleged violations and to write a response to the allegations.  (McCallum

Decl. ¶ 18.)  In her deposition, by contrast, McCallum was asked directly and open-endedly about what she discussed with Wolfe during the termination meeting, and McCallum did not even hint that Wolfe pressured her in any way to admit fault or write responses.  (McCallum Dep. 178:1–179:22, ECF No. 30-4.)   At one point during her deposition, Archstone's counsel characterized the termination meeting as giving McCallum an "opportunity" to provide comments.  (McCallum Dep. 178:12.)  Given the assertions put forth in her declaration, one would expect McCallum to challenge this more congenial characterization, but she simply said she and Wolfe had a "discussion" followed by an "opportunity" for McCallum to write her own comments.  (McCallum Dep. 178:13–14.)  Unlike the interrogatory and deposition questions relating to the physical reaction of Wolfe and Taylor to the pregnancy announcement, here, the deposition question encompassed the more recent allegation put forth in McCallum's declaration.  Therefore, the court strikes this contradictory version of events that first appears in McCallum's declaration.[6]

Finally, the court will not consider those statements offered by McCallum that amount to unsubstantiated self-assessments of her own performance as an Archstone employee.[7]  As

---

[6]     Additionally, Archstone moves to strike McCallum's allegation that she did not have an opportunity to explain to Wolfe why she chose to leave a message instead of to speak to a manager when she called out of work on June 8 in violation of company policy.  (McCallum Decl. ¶ 17.)  To the extent McCallum is asserting that she had no opportunity to explain her behavior including at the termination meeting, the court will disregard it because it conflicts with McCallum's deposition testimony where she stated that she went through each issue in the termination memorandum with Wolfe "one-by-one" during the termination meeting.  (McCallum Dep. 178:3–5.)  But the rest of the statement including her assertion that no one raised the issue with her prior to the termination meeting is not contradicted, nor is it within the scope of any other question directed to her.  Accordingly, the remainder of this assertion is not stricken.

[7]     These statements include McCallum's characterization of her performance based on the type of work she was asked to do, (McCallum Decl. ¶ 4,) as well as her claim that she led the

14

detailed below, McCallum's "unsubstantiated allegations and bald assertions concerning her own qualifications" have no bearing on the outcome of this case. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

**B.      Merits of the Pregnancy Discrimination Claim**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act of 1978 ("PDA") amended Title VII by providing that discrimination because of sex includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  Accordingly, courts treat pregnancy discrimination claims in the same manner as any other sex discrimination claim brought under Title VII.  *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (quoting *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996)).

A plaintiff alleging pregnancy discrimination may defeat a summary judgment motion in one of two ways.  First, a plaintiff may provide direct evidence of pregnancy discrimination.  *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). Second, a plaintiff may proceed using the burden shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973).  McCallum has not argued that direct evidence supports her claim and has instead proceeded under the *McDonnell Douglas* framework.  Under the *McDonnell Douglas* framework, the employee must first make out a prima facie case of pregnancy discrimination.  *Id.* at 285.  If she establishes a prima facie case,

---

office in leasing "[d]uring the majority of [her] time as a Leasing Consultant."  (McCallum ¶ 5.)

the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* And if the employer meets this burden of production, then the burden shifts back to the employee to prove that the employer's reasons for the employment decision "were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). Throughout this burden shifting framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (internal citations and quotation marks omitted).

## 1. The Prima Facie Case

To demonstrate a prima facie case of discriminatory discharge under the *McDonnell Douglas* framework, McCallum must establish that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill*, 354 F.3d at 285. Archstone concedes that McCallum was a member of a protected class, she suffered an adverse employment action, and her position was filled by similarly qualified applicants outside the protected class. Archstone argues, however, that McCallum cannot make out a prima facie case because she has not proven that she was meeting Archstone's legitimate expectations at the time she was fired.

The legitimate expectations element of the prima facie case requires a plaintiff to prove by a preponderance of the evidence "that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Warch v.*

*Ohio Cas. Ins. Co.*, 435 F.3d 510, 515 (4th Cir. 2006) (internal citation and quotation marks omitted).  The Fourth Circuit has made clear that this element is not an empty requirement that a plaintiff can simply gloss over.  *See id.* ("Diluting this element of the prima facie case defeats the whole purpose of this first stage of the *McDonnell Douglas* inquiry. . . ." (internal quotation marks omitted)).  In this inquiry, only the employer's perception, not the employee's self-perception, is relevant.  *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citing *Evans*, 80 F.3d at 960).  An employee need not, however, demonstrate a record of perfect performance.  *See Brown v. Siemens Healthcare Diagnostics, Inc.*, No. DKC-11-0769, 2012 WL 3136457, at *6 (D. Md. July 31, 2012) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)).  Although the burden is on the employee, the employer may offer evidence defining its job expectations and evidence that the employee in question failed to meet those expectations, all of which may properly overlap with evidence relating to the second stage of the *McDonnell Douglas* analysis—the employer's nondiscriminatory reason for the adverse employment decision.  *See Warch*, 435 F.3d at 516.  When the employer asserts that its legitimate expectations have not been met, the employee may offer evidence to demonstrate that the employer's expectations are not legitimate.  *Id.* at 517.  In other words, the employee may show that the expectations are a "sham designed to hide the employer's discriminatory purpose." *Id.* at 518 (quoting *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002)).

Whether McCallum has met her burden at this stage is a close question.  Some of the evidence McCallum offers is decidedly insufficient.  For instance, McCallum's self-assessment of her performance, including her unsupported claim that she led the office in leasing, is not enough to meet her burden.  *See Mungro v. Giant Food, Inc.*, 187 F. Supp. 2d 518, 522 (D. Md.

2002) ("What matters is not the employee's self-perception regarding the quality of his job performance, but the perception of the decision-maker." (internal citations and quotation marks omitted)). Although she may have led the office in leasing at the time of her appraisal in November 2007, there is no evidence to support the claim that she continued to perform at this level. Furthermore, her leasing prowess, even if supported by record evidence, would not change the fact that she allegedly failed to meet Archstone's legitimate expectations in other areas, namely in following workplace rules. Similarly, statements from residents expressing their satisfaction with McCallum's performance lack probative value. *See Warch*, 435 F.3d at 518 (finding that opinions "by third parties who were never employed" by the defendant company did not show that the employee was meeting the employer's legitimate expectations).[8]

Other evidence that McCallum cites is more helpful to her case. McCallum's primary and most concrete support for her argument is the November 2007 performance appraisal, in which she received a rating of "Meets Expectations." (ECF 26 at 24.) McCallum also claims that she regularly received compliments on her performance from various supervisors, and she recalls two specific instances when managers praised her performance both to customers and in front of her coworkers. (McCallum Dep. 124:3–127:7, 126:11–18; ECF No. 26-4 at 2.) Because McCallum was terminated for violating company policies, not for poor leasing performance or problems with tenants, the November 2007 appraisal is the most relevant because it encompassed all aspects of her performance at Archstone, noted some of her failures with regard

---

[8] McCallum could have, but did not, offer qualified expert testimony about Archstone's legitimate expectations and her performance in light of those expectations. *See King*, 328 F.3d at 150 (noting that a plaintiff's co-workers may qualify as expert witnesses to assist a plaintiff in meeting her prima facie burden).

to Archstone policies, and yet still gave her a rating of "Meets Expectations." (ECF No. 21-9.)
But even the November 2007 appraisal only shows that she met Archstone's expectations seven
months prior to her termination and is thus not necessarily relevant to the critical inquiry—
whether or not she was meeting Archstone's legitimate expectations at the time she was fired.
*See O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995), *rev'd on other
grounds*, 517 U.S. 308 (1996) (holding that a performance review of 1989, bonus from 1989, and
salary data from 1989 were irrelevant to the issue of whether the employee was meeting the
employer's legitimate expectations at the time of the termination in August of 1990). The reason
for this conclusion is simple—"[t]he further back in time a court goes to evaluate an employee's
performance, the more removed the evidence is from the time of the termination." *See Warch*,
435 F.3d at 516; *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982) ("The
rationality, hence fairness, of this inference [of discrimination] obviously decreases as the time
gap between last proven satisfactory performance and challenged employment action
lengthens."). The question then becomes whether anything occurred after the November 2007
performance evaluation and other informal positive performance appraisals that shows that
McCallum was no longer meeting Archstone's legitimate expectations. *See generally Anderson
v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir. 1992) ("If Anderson was meeting the
company's expectations in December of 1984, then, and the letters simply indicated that the same
problem was continuing, it is at least arguable that he was meeting Stauffer's expectations at the
time of his termination.").

The answer is not enough changed to show that McCallum was no longer meeting
Archstone's legitimate expectations when she was fired. McCallum was never a perfect

employee, but her burden at this stage does not require proof of perfection.  *See Brown*, 2012 WL 3136457, at \*7.  A close analysis of the November 2007 appraisal demonstrates that Archstone's expectations of its employees tolerated some degree of deviation from certain company policies.  In that appraisal, McCallum was cited for problems with her uniform, attendance, and accuracy with paperwork, yet she still received an overall rating of "Meets Expectations."  (ECF No. 21-9.)  In the termination memorandum, McCallum was cited for several isolated incidents over the course of two months regarding her compliance with attendance and uniform policies, and these incidents appear to be on par with McCallum's prior adherence to these rules.  Therefore, if Archstone's expectations remained the same as they were in November 2007, then not enough changed to say that McCallum was no longer meeting Archstone's legitimate expectations at least with respect to violations of those policies that appear in both her November 2007 appraisal and her June 2008 termination memorandum.

But that is not the end of the inquiry—the court must next decide whether Archstone's expectations changed between November 2007 and June 2008.  *See Warch*, 435 F.3d at 516 ("[T]he employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations.").[9]  One way for Archstone to do this would be to show that McCallum was given a "last chance" or final warning regarding violations of some policy but failed to improve.  *See Mungro*, 187 F. Supp. 2d at 522 ("A plaintiff who violates company policy and fails to improve his performance despite a warning has not demonstrated satisfactory performance.").  Archstone contends that Wolfe's April 2008 email to

---

[9] None of the supervisors responsible for McCallum's discipline have testified regarding their expectations for McCallum, so the court must look to other evidence.

staff regarding Archstone's attendance policy established the policy's importance and served as a

"final warning" for all Archstone staff, including McCallum. (ECF No. 21-11.) But the email

stated that "written documentation will be imminent" if future violations occurred, not

termination, (ECF No. 21-11,) and it was sent to all staff at Westchester at Cherry Lane, not just

to McCallum. Archstone also points out that McCallum received a verbal counseling in August

2007 for a uniform violation and a verbal counseling in January 2008 for several violations of

the attendance policy, so it argues that these records warned McCallum that subsequent

misconduct could lead to "further corrective action . . . up to and including termination." (ECF

No. 21-10.) But this argument is unpersuasive. The August and January verbal counseling

records were not referenced in the termination memorandum or the termination meeting as a

basis for McCallum's termination. Additionally, although the records stated that termination

may result from future violations and Archstone did not follow a strictly progressive disciplinary

policy, other more serious disciplinary notices were available, yet these incidents resulted in only

the lowest level of discipline: a "Verbal Counseling." *Cf. Mungro*, 187 F. Supp. 2d at 520

(finding that the employee's violation of the "Conditional Return to Duty Agreement" or "last

chance letter" prevented him from showing he met his employer's legitimate expectations

because the letter provided that a subsequent violation of the agreement would lead to immediate

termination). Moreover, McCallum's subsequent alleged violations of the uniform and

attendance policies in the months and days leading up to her termination were more isolated than

in other cases in which courts have concluded the employee was not meeting the employer's

legitimate expectations. *Cf. Farasat v. Paulikas*, 32 F. Supp. 2d 249, 254 (D. Md. 1998)

(holding that employee failed to prove he met his employer's legitimate expectations because he

was repeatedly tardy after receiving numerous written warnings and being told at a meeting that his lateness was unacceptable).  Therefore, the court cannot conclude that McCallum's alleged violations of company policy before she was terminated, alongside her disciplinary history relating to some of those same policies, show she was no longer meeting Archstone's legitimate expectations.

An additional issue raised by McCallum's reliance on the November 2007 appraisal to meet her burden is that two charges in the termination memorandum—the falsification of company records and the violation of Archstone's policy for communicating with cleaning contractors—were not based on policies that McCallum had previously violated.  If Archstone could show that these violations were somehow more serious than other violations committed by McCallum in the past, then McCallum would probably not be able to show that she met Archstone's legitimate expectations.  *See, e.g.*, *Blair v. Colonnas Shipyard Inc.*, 52 F. Supp. 2d 687, 693 (E.D. Va. 1999), *aff'd*, 203 F.3d 819 (4th Cir. 2000) (concluding that employee could not show satisfactory performance because employer "simply adhered to its disciplinary policy by suspending and ultimately discharging" the employee for falsifying records).  Although an Archstone Company Policy Manual is referred to in passing by the parties, a copy has not been attached to any of the motions, and Archstone has not alleged that the policy provided for immediate termination for either the falsification charge or the improper communication with contractors charge.  At the same time, there are reasons for the court to suspect at this stage of the proceeding that these particular accusations may not be accurate.  McCallum has alleged that Wolfe failed to speak with her about the falsification charge to get her side of the story before the termination meeting, which, if true, would be against Archstone's standard practice

according to Archstone's human resources representative. (Lynch Dep. 101:10–17, 134:4–13.) She also claims that her improper communication with cleaning contractors arose from the fact that Wolfe and Taylor shunned her after learning of her pregnancy.

At the end of the day, McCallum's 2007 appraisal, imperfect thought it may be, is still the most persuasive evidence of what Archstone's expectations of McCallum were and that she was meeting them. Although McCallum may have been an imperfect employee when she was fired, she was also an imperfect employee seven months before when she was given an evaluation of "Meets Expectations." While Archstone does not strictly follow a progressive disciplinary policy, (Lynch Dep. 35:13–17,) Archstone could have issued McCallum more serious warnings to signal that its expectations had changed or that she had fallen below an acceptable level of performance, but it did not. According to McCallum, the only warning she received before the termination meeting regarding any of the violations referred to in the termination memorandum came when Wolfe told her "cover up that baby belly" two days before her firing, despite the fact that the violations cited in the memorandum took place over an extended period of time. The court understands that it "does not sit as a 'super-personnel department,'" *Mungro*, 187 F. Supp. 2d at 522 (quoting *DeJarnette*, 133 F.3d at 299), but it also recognizes that an employee's prima facie burden is not supposed to be "onerous" and does not require proof of perfect performance. *See Brown*, 2012 WL 3136457, at *7 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Viewing the evidence in the light most favorable to McCallum, the court concludes that there is not enough evidence to discredit McCallum's 2007 performance appraisal, and thus there is at least a dispute of material fact as to whether McCallum satisfied Archstone's legitimate expectations.

##### 2. The Nondiscriminatory Reason and Pretext

Because McCallum has satisfied her prima facie burden, the burden shifts to Archstone to come forward with a "legitimate, nondiscriminatory reason" for its decision to terminate her employment. *Reeves*, 530 U.S. at 142. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). An employee's failure to abide by company policies is a legitimate, nondiscriminatory reason for discharging the employee. *See Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 656 (D. Md. 2010); *Brantley v. Nationwide Mut. Ins. Co.*, No. RDB-07-1322, 2008 WL 2900953, at *11–12 (D. Md. July 22, 2008). Therefore, Archstone has satisfied its burden by presenting admissible evidence in the form of the termination memorandum, stating the various violations of company policy that McCallum allegedly committed and for which she was fired. Thus, the burden shifts back to McCallum, who must now prove that Archstone's stated reasons were pretextual.

At this stage, "the burden to demonstrate pretext has 'merg[ed] with the ultimate burden of persuading the court that [McCallum] has been the victim of intentional discrimination.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quoting *Burdine*, 450 U.S. at 256). To meet this burden, McCallum "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253). McCallum can meet her burden by proving that Archstone's reasons are "'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [pregnancy] discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004)

(quoting *Burdine*, 450 U.S. at 256).

Here, McCallum has presented sufficient circumstantial evidence from which a reasonable jury could conclude that Archstone's reasons for its decision were pretextual. First, the fact that McCallum was fired only fifteen days after announcing her pregnancy to her supervisors is suspicious. "Temporal proximity between a protected activity and an adverse employment action may support an inference of discrimination." *Canavan v. Rita Ann Distributors*, No. CCB-03-3466, 2005 WL 670777, at *5 (D. Md. Mar. 23, 2005) (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 393–94 (4th Cir. 2001) and *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)). Although suspicious timing is not sufficient to show pretext, its presence is still a factor that supports a finding of pretext. *See Mercer v. Arc of Prince Georges Cnty., Inc.*, No. 13-1300, 2013 WL 3470489, at *6 (4th Cir. July 11, 2013) (per curiam) (citing *Simpson v. Office of Chief Judge of Circuit Court of Will Cnty.*, 559 F.3d 706, 713 (7th Cir. 2009)).

The June 28 incident when, according to McCallum, Wolfe told her to "cover up that baby belly" is also probative of pretext. Comments exhibiting a biased or discriminatory attitude are relevant to the issue of pretext. *See Huang v. Gutierrez*, No. AW-08-2882, 2010 WL 93274, at *10 (D. Md. Jan. 5, 2010) (citing *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 35 (1st Cir. 2001)). Wolfe's comment and patting of McCallum's stomach could charitably be characterized as an awkward and tactless way to encourage McCallum to abide by Archstone's uniform policies, but it could also quite easily be understood as derogatory and disparaging of her pregnancy. The alleged remark was also made under negative circumstances when Wolfe was advising McCallum of a violation of company policy, making it less likely that it was meant as a friendly comment or in jest. Although the remark may not rise to the level of direct evidence of

25

discrimination (and McCallum has not argued that it does), it is still probative of pretext because it was a comment arguably exhibiting an anti-pregnancy bias made by Wolfe, the decision maker who fired McCallum, merely two days before the termination and regarding an issue that was cited in McCallum's termination memorandum—the uniform violation for an improperly fitting jacket. *Cf. Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000) (holding that even stray remarks can be direct evidence of discrimination "when the decision makers themselves . . . express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of"). Because the court must construe the facts and draw reasonable inferences in the light most favorable to McCallum, the court finds that this alleged comment and episode is probative of pretext.

Wolfe and Taylor's reactions to McCallum's pregnancy announcement—both immediately and in the two weeks leading up to her termination—are further circumstantial evidence of pretext. "The employer's initial reaction upon learning of the employee's pregnancy can be circumstantial evidence of pretext and intent to discriminate." *See Notter v. N. Hand Prot., a Div. of Siebe, Inc.*, 89 F.3d 829, 1996 WL 342008, at *7 (4th Cir. June 21, 1996) (unpublished table decision) (per curiam); *see also Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006). Here, McCallum claims that Wolfe and Taylor "seemed angered or upset by the news [of her pregnancy], and neither one of them congratulated [her]." (McCallum Decl. ¶ 6.) Additionally, an employer's sudden change in attitude and demeanor towards an employee upon learning of the employee's pregnancy is also probative of pretext. *See Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 872 (D. Md. 2000). McCallum claims that Wolfe and Taylor avoided her, spoke to her abruptly during their interactions, and otherwise began treating her

differently only after they learned of her pregnancy. (McCallum Decl. ¶¶ 7–10.) It is also noteworthy that Wolfe had not personally recorded any incidents of rules violations by McCallum until after her pregnancy announcement even though three of the alleged violations cited in the termination memorandum took place before the pregnancy announcement.

Finally, Wolfe's alleged failure to investigate the falsification charge before deciding to fire McCallum in violation of its own practices is circumstantial evidence that tends to show that the falsification accusation is pretextual. An employer's violation of its own policy can be evidence of pretext, but it is not sufficient to prove pretext. *See Parris v. Bd. of Educ. of Baltimore Cnty.*, No. L-09-0704, 2011 WL 3320326, at *4 (D. Md. July 25, 2011), *aff'd sub nom. Parris v. Baltimore Cnty. Bd. of Educ.*, 473 F. App'x 346 (4th Cir. 2012). Archstone's human resources representative testified that it was Archstone's standard practice to approach an employee accused of falsifying records to hear her side of the story before deciding on the appropriate consequences. (Lynch Dep. 101:10–17, 134:3–13.) In this case, McCallum alleges that the first time she heard of the falsification charge was during the termination meeting, and that she never had an opportunity to examine her own records to defend herself. The only evidence that McCallum was in fact approached before the termination meeting comes from a passing reference in the termination memorandum that McCallum "was unable to provide any additional documentary support to this lead," (ECF No. 26-7,) as well as Wolfe's testimony at the unemployment benefits hearing. But there is no evidence that Wolfe ever responded to Hershey's suggestion that a technical glitch might explain McCallum's curious entry, and there is no contemporaneous record evidence of any discussion between Wolfe and McCallum before the termination meeting. If Archstone did disregard its standard practice and failed to seek

McCallum's side of the story before reaching its decision, this would be especially probative of pretext given that McCallum has argued that she did not have an obvious incentive to falsify a lead entry. And even if Archstone did not have a standard practice of asking employees about falsification charges before terminating them, Wolfe would still have needed to speak with McCallum in order to form an honest belief and make an informed decision about the falsification accusation. Therefore, McCallum's allegation that Wolfe never approached her about the accusation undermines the credibility of the decision and is thus evidence of pretext. *See generally E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 853–54 (4th Cir. 2001) (finding evidence of pretext based on employer's admission that she made an uninformed decision before taking adverse employment action).[10]

---

[10] McCallum's final argument is based on the relative insignificance of the policies that she allegedly violated. But in order for this argument to have teeth, she would need to show that similarly situated Archstone employees were not treated as harshly as she was for it is not the court's "province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000). Thus, McCallum rightly frames her argument in relation to how Archstone treated other employees. The relevance of comparator evidence in the pretext analysis, however, requires a showing that the other employees were similarly situated in all relevant respects without significant differentiating circumstances. *See Grice v. Baltimore Cnty., Md.*, No. JFM-07-1701, 2008 WL 4849322, at *10 (D. Md. Nov. 5, 2008), *aff'd*, 354 F. App'x 742 (4th Cir. 2009). McCallum has referred the court to two employees, Tia Snead and Leticia Taylor, but the disciplinary histories of these employees differed from McCallum's, most notably in that neither of them was ever accused of falsifying records. Therefore, the different treatment given to Snead and Taylor is not probative of pretext.

But just as McCallum needs to establish the similarity of comparators in all relevant respects, so too does Archstone if it seeks to show that it treated nonpregnant employees in the same way it treated McCallum. Archstone has offered one employee who engaged in a violation of the company's email policy, making her violation unrelated to McCallum's, and another employee who was terminated for falsification of records. It has not, however, provided any context for the alleged violation, description of the employee's disciplinary history, or information regarding how the falsification was investigated. Therefore, although this employee was also fired for allegedly falsifying records, Archstone has not offered enough evidence to make this a meaningful comparison that would counter the strong circumstantial evidence that

Because McCallum has made out a prima facie case and offered sufficient evidence of pretext including the contemporaneous biased statement by Wolfe, a jury may reasonably infer that the employer engaged in unlawful discrimination. *See Reeves*, 530 U.S. at 147; *Sears Roebuck*, 243 F.3d at 854. Although the jury may ultimately side with Archstone at trial, McCallum has presented sufficient evidence to survive summary judgment. Accordingly, Archstone's motion for summary judgment is denied.

**CONCLUSION**

For the reasons stated above, the motion for summary judgment is denied. A separate order follows.

October 2, 2013                                         /s/
Date                                                      J. Frederick Motz
                                                     United States District Judge

---

Archstone's stated reasons are pretextual.

Relatedly, in its reply, Archstone argues that the court should consider the fact that Wolfe supervised other employees who were pregnant at other properties and at other times without incident. Even though this may be relevant to whether Wolfe's decision to fire McCallum was discriminatorily motivated, it is not conclusive proof that it was not discriminatorily motivated. In the face of other evidence showing pretext and from which the jury could conclude discrimination motivated the decision, the court declines to find that the presence of this evidence means that "no rational factfinder could conclude that the action was discriminatory." *See Reeves*, 530 U.S. at 148,153.